[PHILADELPHIA, JANUARY 7th, 1837.]

2 Wh 53
29 SC 212

## CAMPBELL and Another *against* The PENNSYLVANIA LIFE INSURANCE COMPANY, &c.

·When a trustee becomes the purchaser of the trust estate, the *cestui que trust* may set aside the purchase.

The principle extends not only to a trustee, properly so called, but to judicial officers and all other persons who in any respect have a concern in the disposition and sale of the property of others; and it is immaterial whether the sale is public or private, judicial or otherwise, or for a *bona fide* price.

By an indenture between the plaintiffs and defendants, (who were an incorporated company for making insurance on lives and granting annuities,) reciting that A. by his last will, &c. having charged his estate with the payment of an annuity of $500 to his widow, it was agreed between the legatees and executors that the same should be secured to her from certain funds therein mentioned and provided for by a purchase from the said company or otherwise; a part of which funds consisted in two bonds executed by B., each conditioned for the payment of $7000 in seven successive annual payments with interest, which bonds were secured by a mortgage of certain real estate; and reciting among other things, that it had been agreed to purchase the said annuity of the company, and that it had become necessary to sell and dispose of the said bonds and mortgage; it was witnessed that the plaintiffs, in consideration of $8000 to them paid (for the purposes aforesaid and to the intent that the said agreements should be fulfilled) by the said company, had assigned, &c. the said bonds and mortgage, and the money thereby secured, (then amounting and reduced to $10,000 in all,) and the mortgaged premises, to the said company, their successors and assigns forever: Provided, that when the company should receive any of the instalments payable on the said bonds, the amount so received should be deemed to be on account of the said $8000, and that the interest received by them should be applied in like manner to the payment of interest on the said sum of $8000 and the balance or residue paid to the plaintiffs: and further, that when the company should have received the full amount of $8000, then all their estate and interest, power and authority should cease, and if there should be in their possession any balance or surplus, they would in like manner pay it over: and further, that a paramount right of purchasing the last instalment in each bond should be reserved to the company; but if they should not purchase the same, they would not interfere with the recovery thereof, but on demand re-assign the same to the plaintiffs, &c.: and further, that the said company should have full power to *extend or alter the time* for paying any instalment except the last, but in such case such instalment should be deemed and accounted for by the said company as if the same had been actually paid off, &c.: and finally, the plaintiffs appointed the said company their attorney for them and in their names, (if necessary,) but for their own use, to sue for, recover and receive from the obligor the sum of money due upon the said bond, &c.: *Held*, that this instrument did not make the defendants trustees for the plaintiffs in any other respect than to pay over to them any surplus that they might receive beyond the $8000 and interest; and the defendants having, after the last instalment became due, brought suit upon the mortgage, and by virtue of an execution sold the mortgaged premises at sheriff's sale, and purchased the same for $7000, and having afterwards sold the same by private contract for $10,000, it was *held* that they had a right so to purchase, and that they were not accountable to the plaintiffs for the profits made by them.

THIS was an action for money had and received, brought by Samuel Campbell and John Chambers who survived George Davis,

trustees, &c., against the Pennsylvania Company for Insurances on Lives and granting Annuities.

The cause was tried on the 9th day of February, 1836, before Mr. Justice KENNEDY and a special jury.

The plaintiffs gave in evidence an indenture, dated the 9th day of February, A. D. 1822, between Samuel Paterson Campbell and others, and the defendants, in the following terms:—

" This indenture made this ninth day of February, in the year of our Lord, one thousand eight hundred and twenty-two, between Samuel Paterson Campbell, of Union-town, in the county of Fayette, in the state of Pennsylvania, gentleman, one of the heirs at law, and devisees of Robert Campbell, formerly of the city of Philadelphia, bookseller, deceased, by George Davis, his attorney duly constituted and appointed, Samuel Campbell and John Chambers, both of the city of New York, booksellers, and the said George Davis, trustees for the said Samuel Paterson Campbell, named in a certain indenture, bearing date on the twenty-third day of August, one thousand eight hundred and sixteen, recorded at Philadelphia aforesaid, in Deed Book, M. R. No. 14, page 10, &c., Robert Campbell, the other heir at law, and devisee of the said Robert Campbell, deceased, Gavin Hamilton, of the city of Philadelphia aforesaid, tobacconist, and the said Samuel Campbell, surviving executors, named in and by the last will and testament of the said Robert Campbell, deceased, bearing date on the nineteenth day of August, one thousand seven hundred and ninety-nine, duly proved and remaining in the Register's Office, in the city of Philadelphia aforesaid, the said Samuel Campbell and John Chambers, in their respective capacities, by John C. Lowber, of the city of Philadelphia, their attorney duly constituted and appointed by letter bearing date on the seventeenth day of January last past, and intended to be forthwith recorded, all of the first part; and the Pennsylvania Company for Insurances on Lives and granting Annuities, of the city of Philadelphia aforesaid, of the other part, witnesseth, that whereas by certain articles of agreement made between the said Samuel Paterson Campbell of the first part; the said Samuel Campbell, George Chambers, and George Davis, trustees as aforesaid, of the second part; and the said Samuel Campbell, executor, as aforesaid, of the third part ; bearing date on the eighteenth day of July last past, and intended to be forthwith recorded, it was among other things declared and agreed, that the said Robert Campbell, deceased, having by his last will and testament aforesaid, charged his estate with the payment of a certain annuity or yearly sum of five hundred dollars, lawful money of the United States, to his widow, Sarah Davis, now wife of the said George Davis, during her natural life; that the same should be secured unto her from certain funds therein mentioned and specified; and provided for by a purchase from the said company, or

(Campbell *v.* The Pennsylvania Life Ins. Co.)

such other safe fund as she should think proper, and direct; a part of which said funds so mentioned and specified, consisted of two certain bonds or obligations and warrants of attorney thereto annexed in writing duly executed, bearing date on the thirtieth day of July, one thousand eight hundred and seventeen, wherein and whereby John G. Langstroth, of the city of Philadelphia, merchant, acknowledged himself to be held and firmly bound in the penal sum of twenty-eight thousand dollars, conditioned by one of them to pay unto the said Gavin Hamilton, and Samuel Campbell, executors as aforesaid, the sum of seven thousand dollars, lawful money aforesaid, in seven successive annual payments, of one thousand dollars each, on the first day of June in every year, together with lawful interest for the same; and by the other of them, to pay to the said Samuel Campbell, George Davis and John Chambers, trustees as aforesaid, the like sum of seven thousand dollars, lawful money aforesaid, in manner and form, and upon the same days and at the time above mentioned, deducting however from each of the three first instalments, a moiety of what might then be due on a mortgage debt, for which the premises hereinafter described, were subject to, and liable for the payment of, to John Livezey; and for the better securing the payment of which said sums of money as aforesaid, the said John G. Langstroth did by an indenture of mortgage, bearing even date with the said obligations, and recorded at Philadelphia aforesaid, in Mortgage Book, M. R. No. 6, page 393, &c., grant and convey unto the said Gavin Hamilton, Samuel Campbell, George Davis and John Chambers, and their heirs and assigns forever, all that certain stone messuage paper-mill and tract of land, situate on the waters of the Wissahicon creek, in Roxborough township, in the county of Philadelphia, and state of Pennsylvania aforesaid, containing *eighty-three acres and twenty-one perches and an half, more or less;* (being the same which the said Gavin Hamilton, Samuel Paterson Campbell, Samuel Campbell and George Davis, and John Chambers, by indenture, bearing date on the same day and year last aforesaid, recorded at Philadelphia aforesaid, in Deed Book, M. R, No. 17, page 14, &c. granted to the said John G. Langstroth in fee, the said sums of money in the said obligations mentioned with the said deductions, being a part of the consideration of the said grant; the said premises being also a part of the funds and estate of the said Robert Campbell, deceased.) And the said parties did by the said articles, further consent and agree, that as the said sums of money in the said bonds or obligations mentioned were not entirely due, that the same might be sold and disposed of for the intents and purposes aforesaid, and for such other intents and purposes as are therein mentioned and provided. And the said Samuel Paterson Campbell, by the said letter of attorney, bearing date with the said articles recorded at Philadelphia aforesaid, in Letter of Attorney Book, M. R. No. 2, page 440, &c., did

nominate and appoint the said George Davis, as his true and lawful attorney, to see and cause to be fulfilled and carried into effect, all and every the covenants, stipulations and conditions, mentioned and set forth in and by the said articles of agreement; all which by reference thereto, will more fully and at large appear. And whereas it has been agreed upon by and among the said parties of the first part, with the consent and approbation of the said Sarah Davis, to purchase the said annuity or yearly sum of five hundred dollars, of and from the Pennsylvania Company party hereto, a part of which has been paid for from other funds, for the purpose of fully providing for the same : it has become therefore necessary to sell and dispose of the said two bonds or obligations, indenture of mortgage and messuage and premises thereby granted, and sum and sums of money therein mentioned and secured, as is authorised and provided in and by the articles of agreement aforesaid.

Now this indenture witnesseth, that the said parties of the first part, for and in consideration of the sum of eight thousand dollars lawful money aforesaid, to them paid, (for the uses and purposes aforesaid, and to the intent that the stipulations and agreements in the said articles contained, should be fulfilled and completed) by the Pennsylvania Company aforesaid, at or before the execution hereof, the receipt of which they respectively do hereby acknowledge, have granted, bargained and sold, assigned, transferred and set over and by these presents do, and each and every of them doth grant, bargain and sell, assign, transfer and set over unto the Pennsylvania Company for Insurances on lives, and granting annuities aforesaid, the said two bonds or obligations and warrants of attorney thereto annexed, and the said indenture of mortgage executed as aforesaid by the said John G. Langstroth, and the said stone messuage, paper mill, tract of land and appurtenances thereby granted, and the sum and sums of money therein mentioned and secured, now amounting and reduced to the sum of five thousand dollars in each of the said bonds or obligations by the payments and deductions as is therein respectively allowed and provided for, and the interest due and hereafter to grow due thereon, and all the rights, remedies, ways and means whatsoever for recovery and obtaining payment thereof; and all the estate, right, title, interest, property, claim and demand, and all benefit and advantage thereof whatsoever, of the said parties of the first part and of each and every of them in law, equity or otherwise howsoever, of, in, to and out of the same, and every of them, and every part thereof: To have, hold, levy, take and receive all and singular the sum and sums of money, hereditaments and premises hereby granted and assigned with the incidents and appurtenances thereunto belonging, or in any wise appertaining to the Pennsylvania Company for insurances on lives and granting annuities aforesaid, to the only proper use, benefit and behoof of the Pennsylvania Company for insurances on lives and granting annui-

ties aforesaid, their successors and assigns forever: Provided always, nevertheless, and it is hereby mutually agreed upon and understood by and between the said parties to these presents, that before the payment of the said sum of eight thousand dollars, the consideration above mentioned, shall be demanded of the said company, that the said parties of the first part, shall obtain and procure of, and from the said John Livezey, his heirs or assigns, such sufficient assignment or conveyance of the said mortgage debt, or so much thereof, as is now due and charged as aforesaid upon the said messuage, paper mill, tract of land and appurtenances, whereby the payment thereof and the interest shall be postponed and deferred, so that the sum and sums of money hereby granted, and every part thereof, and the interest thereof shall be and remain a first and prior charge and incumbrance in and upon the said messuage, tract of land and appurtenances, to be first paid off and satisfied. And further, that whenever the said company shall receive any of the instalments and payments mentioned in the said obligations or any part thereof, that the sum and amount thereof, shall be deemed and considered as for and on account of the said sum of eight thousand dollars, and the same shall thenceforth be considered as reduced, and diminished accordingly; and also, that the amount of interest of the said sum and sums of money hereby assigned, upon receipt thereof by the said Company, shall be forthwith applied for the payment and discharge of the interest upon the sum of eight thousand dollars aforesaid, or whatever sum it may be reduced to, computing the same from the day of the date of these presents, until the first day of June in every year, and the balance and residue thereof shall upon demand be paid to the said parties of the first part according to their respective interests, or otherwise appropriated as they may direct and appoint.

And further, that whenever the said Company shall have received the full amount of the said sum of eight thousand dollars, and the interest thereof, that then, and in such case, all the estate and interest, power and authority hereby given and granted, shall cease and determine, and if there shall then be in their possession any balance and surplus, that they will upon demand pay over or otherwise appropriate the same as is above mentioned. And further, that a prior and paramount right and privilege of purchasing the last instalment mentioned in the said obligations respectively, with the incidents and appurtenances, is hereby reserved by and given and granted to the said Company; but if they shall not purchase the same, that they will not in any way interfere with or impede the recovery thereof, but will upon demand assign and re-convey the same to the said parties of the first part, according to their respective interests; and as much as in them lies, and they may legally do, aid, and assist in the recovery and obtaining payment thereof, but at the proper cost, charge and expense of the said parties of the first part, demanding the same. And further, that the said Company shall

have full power and authority to extend, change, and alter the day and time upon which all or any of the said instalments, excepting only the said last instalments, are by the conditions of the said obligations respectively made payable; but that then, and in every such case, the amount thereof shall be deemed, considered and accounted for by the said Company, as if the same had been actually paid off and discharged at the day and time fixed and appointed therefor, and that thenceforth the said parties of the first part, or any of them shall not in any way be liable for or charged with any default or loss of the same or any part thereof, or the interest thereon afterwards accruing. And lastly, the said parties of the first part, for the better carrying into effect the objects, intents, and purposes aforesaid, have nominated, constituted and appointed, and by these presents do, and each of them doth nominate, constitute and appoint the Pennsylvania Company for insurances on lives, &c. aforesaid, their true and lawful attorney, irrevocable, for them and in their names (if necessary) but for the use and behoof of the said Company as aforesaid, to ask, demand, sue for, recover and receive of, and from the said John G. Langstroth, his heirs or assigns, or whomsoever may be liable to pay the same, the said sum and sums of money, and every of them, and every part thereof, and the interest; and receipts or other sufficient discharges for the same, to make and give; and generally to do, execute and perform all and every act or thing necessary to be done in and about the premises, as fully and effectually to all intents and purposes, as they might or could do if personally present: hereby ratifying and confirming all and whatsoever shall be legally done by virtue hereof.

In witness whereof the said parties have hereunto interchangeably set their hands and affixed their seals: Dated the day and year first above written."

The defendants instituted a *scire facias* on the mortgage assigned by the foregoing indenture, in the District Court for the city and county of Philadelphia, to June Term, 1831, No. 444; and on the 9th of August, 1831, obtained judgment. Under an *alias levari facias* on this judgment, issued to March Term, 1832, No. 33, the mortgaged premises were exposed to sale on the 29th of February, 1832, and bought by the defendants for the sum of seven thousand dollars. A deed poll was executed by George Rees, Esq., High Sheriff, to the defendants for the premises, bearing date the 12th day of June, 1832, and acknowledged the 14th of June, 1832.

The plaintiffs further gave in evidence an indenture of the 10th of August, 1832, by which the defendants conveyed the premises to Joshua Garsed, John Raines, Joshua Garsed, jr. and William Willock, in consideration of ten thousand dollars. Also, a mortgage by the said Joshua Garsed, Joshua Garsed, jr., John Raines and William Willock, to the defendants, dated the 10th day of August, 1832,

reciting a bond of the said mortgagors to the defendants, in the penal sum of twenty thousand dollars, conditioned for the payment of ten thousand dollars on the 10th of August, 1837, with interest at 5 per cent. payable half yearly, and conveying to the defendants in mortgage to secure the said bond, the premises above mentioned.

The plaintiffs further gave in evidence an entry on the record of the said mortgage, bearing date the 28th of March, 1833, of satisfaction of principal and interest of said mortgage, made by Joseph Roberts, attorney in fact of the defendants.

The *defendants* gave in evidence—

An indenture of mortgage by Joshua Garsed, Joshua Garsed, jr., and William Willock to the defendants, dated the 25th day of March, 1833, recorded the 28th of March, 1833, reciting a bond of the mortgagors to the defendants, in the penal sum of twenty thousand dollars, conditioned for the payment of ten thousand dollars in four years and six months from the date, with interest at 5 per cent., payable half-yearly, and conveying to the defendants *inter alia* the premises above mentioned.

The defendants also produced an account of the sums received by them, for interest on the mortgage of Langstroth, assigned by the first mentioned indenture and of their payments to the plaintiffs; and also produced receipts for the payments so made by them. The account produced which was dated November 2d, 1835, charged Langstroth with the several years interest on $8000, from June 1st, 1823, to June 1st, 1831, inclusive; also with interest on $1000, annually paid to the trustees, with the costs of the suit on the mortgage, and with the principal sum of $8000; and credited him with sundry payments, amounting to $5280, and with the cost of the mortgaged premises, $7000, and claimed a balance due to the company of $1097 66.

The defendants also claimed credit for certain sums paid to counsel for professional services; for taxes on the mortgaged premises and other expenses in relation to them; in the whole amounting to $722 16.

The plaintiff claimed to recover one half of the sum of $2000, the excess of the purchase money on the sale to Garsed and others, over the debt due to the defendants, with interest from the date of sale.

Judgment was entered for the defendants under the following agreement:—

" It is agreed that judgment be entered, in favour of the defendants. If the court should be of opinion on the facts in evidence, that the plaintiffs are in any form of action entitled to recover, then judgment to be entered for the plaintiffs, for such sum, and in such manner, as the court shall direct.

If the court shall be of opinion, that the plaintiffs have prematurely

brought this action, and that the only objections to their recovery are the time at which the suit is brought, and that the money has not been actually received by the company; their rights to recover hereafter, not to be prejudiced by the judgment in this case.

If the court should be of opinion on the merits of the case, that judgment should be for the defendants, then the same to be final.

The court above, to have the power of a court and jury, in·settling questions of fact."

Mr. *M'Call,* for the plaintiffs.

The defendants are to be considered as trustees for the plaintiffs, in respect to the surplus of the money secured by the mortgage beyond the sum of $8000, and as such liable to all the rules which the law has established in respect to persons holding that character.

From the earliest time courts of equity have refused to countenance the purchase of the trust property by trustees, no matter how fair the proceeding, and have required them to account for any profit that may be made on the purchase. The rule is founded in reason, and has been sustained by motives of policy, independently of particular frauds. In *Exparte Bennet,* (10 *Ves.* 385,) which was the case of a purchase by a solicitor in bankruptcy, the foundation of the rule is strongly stated by Lord ELDON ; in *Whichcote* v. *Lawrence,* (3 *Ves.* 750,) it had been stated in similar terms by Lord ROSSLYN ; and by Chancellor KENT, in *Davoue* v. *Fanning,* (2 *Johns. C. R.* 252.) The rule is believed to prevail to nearly the same extent in every state of the union. In Pennsylvania, it is recognized in the cases of *Eichelberger* v. *Barnitz,* (1 *Yeates,* 307.) *Lazarus* v. *Bryson,* (3 *Binn.* 54.) *Prevost* v. *Gratz,* (1 *Peters'* C. C. R. 64.) *Wallington's Estate,* (1 *Ashmead,* 307,) where the subject is fully discussed by Judge KING ; and in *Stewart* v. *Gibbons,* (*MS.*) before the ·late Chief Justice TILGHMAN, at Nisi Prius, in April, 1823, which was the case of a purchase by a scrivener employed by the plaintiff. In New York, in *Green* v. *Winter,* (1 *Johns. C. R.* 27) *Parkist* v. *Alexander,* (*Id.* 394.) *Vanhorn* v. *Fonda,* (5 *Johns. C. R.*588.) *Case* v. *Abeille,* (1 *Paige, C. R.* 393, 630.) ' *Rogers* v. *Rogers,* (1 *Hopkins C. R.* 515.) *Cator* v. *Le Roy de Chaumont,* (3 *Paige,* 178.) *Pearson* v. *Thompson,* (1 *Edwards,* 212.) In *New Jersey,* in *Arrowsmith* v. *Van Harlingen,* (1 *Coxe,* 126.) In *Maryland,* in *Conway* v. *Green,* (1 *Har. & Johns.* 52.) *Davis* v. *Simpson,* (5 *Har. & Johns.* 147.) *Richardson* v. *Jones,* (3 *Gill & Johns.* 163.) In *North Carolina,* in *Gordon* v. *Finley,* (3 *Hawks,* 239.) In *South Carolina,* in *Butler* v. *Haskill,* (4 *Dessauss. Rep.* 702.) *Tennessee,* in *Armstrong* v. *Campbell,* (3 *Yerger,* 201.) *Wade* v. *Harper,* (*Id.* 383.) Here it became the duty of the defendants to make the mortgaged property bring its utmost value. *Hart* v. *Ten Eyck,* (2 *Johns. C. R.* 110 ;) but their interest lay in another direction. Then is there any thing in a *judicial* sale such

as took place on this mortgage, to make any difference in the application of the general rule. In reason, there is nothing. Where the sale is brought on by the trustee alone, there is no difference between a judicial and other sale. In the case of a sale upon an execution issued by a third person, the rule may be different. The foundation is not the narrow one, that a trustee cannot convey to himself; but courts have always looked to the temptation of obtaining a sale at a time convenient to himself, and when it was likely to reduce the public competition. In several cases, the opinion of our courts has been expressed adversely to purchases by trustees at judicial sales. *Wade* v. *Harper*, (3 *Yerger*, 383.) *Pearson* v. *Thompson*, (1 *Edwards*, 212.) *Fellows* v. *Fellows*, (4 *Cowen*, 682.) *Rogers* v. *Rogers*, (1 *Hopkins*, 515.) *Cator* v. *Le Roy*, &c. (3 *Paige*, 178.) So in England, *Exparte James*, (8 *Ves.* 337.) *Exparte Lacy*, (6 *Ves.* 625.) It is no answer to say, that the trustee might have lost by the purchase. The law forbids any dealing with the estate, no matter how it may terminate.

As to the form of action. It appears that the defendants sold upon a credit, taking bonds payable in 1837. As regards the plaintiffs, this is to be considered as a payment in money; and therefore assumpsit for money had and received will lie. They acknowledged satisfaction it appears of one mortgage, and discharged one of the mortgagors. *Hopkins* v. *M'Claren*, (4 *Cowen*, 669.) *Ward* v. *Evans*, (2 *Lord Raym.* 928.) *Nightingale* v. *Devisme*, (5 *Burr.* 2589.) *Beardsley* v. *Root*, (11 *Johns. Rep.* 464.) *Martzell* v. *Stouffer*, (3 *Penn. Rep.* 398.)

Mr. *H. J. Williams* and Mr. *Randall*, for the defendants.

We deny altogether that the relation of *cestuique trust* and trustee ever existed between these parties, in the sense contended for on the other side. The proviso in the assignment of the mortgage, it is obvious, made the defendants trustees only for any surplus of money that might arise on a sale of the premises by process of law: or the trust was, on payment of the debt due to the defendants, to re-assign the bonds to the plaintiffs. We are willing now to re-assign the bonds to the plaintiffs, who may recover from Langstroth. The right of an assignee of a mortgage to proceed at law to sell the mortgaged premises and purchase them for himself, cannot be disputed. The case of *Prevost* v. *Gratz*, shows that this right is not lost by our being trustees for any surplus. Even if trustees in the sense contended for on the part of the plaintiffs, we have a right to purchase at a judicial sale. The case of *Lazarus* v. *Bryson*, (3 *Binn.* 54,) shows that the *sheriff* is the vendor at a sale upon an execution, not the execution creditor. The question always is, whether the trustee had any peculiar means of information, or pursued an unusual course with respect to the sale. This is not like the case of an executor or administrator, as in *Rogers* v. *Rogers* and *Wal-*

*lington's Estate,* cited on the other side. In *Eichelberger v. Barnitz,* the decision was in favour of the trustee. In *Prevost* v. *Gratz,* Judge WASHINGTON said, that he knew of no principle which prevented a trustee purchasing at another's sale. The case of *Dobbins* v. *Stevens,* (17 *Serg. & Rawle,* 13,) is a strong authority in our favour. There the defendant, a counsellor at law, had given an opinion which prevented others from buying, yet he afterward bought the property. [GIBSON, C. J.—That case was free from any imputation of fraud. HUSTON, J.—*Dobbins* v. *Stevens* was tried before me, and I ruled that the defendant could not buy. A new trial was granted; but the case was afterwards compromised.] In *Power* v. *Holman,* (2 *Watts,* 218,) a trustee for an insolvent, purchased the insolvent's real estate; and the purchase was sustained. [ROGERS, J.—In that case the defendant had not accepted the trust; and the presumption arose from lapse of time, that the debts were all paid.] The case of *Delamater's Estate,* (1 *Wharton's Rep.* 374,) shows that a trustee may purchase the trust property, if there be no fraud. Whatever may be the rule or policy of the law however, in respect to trustees, there is nothing in the agreement of the parties or the conduct of the defendants, to bring them within it. They could proceed in no other way to recover the money due to them than they have done. The cases of joint interest do not apply; the interests here were not joint, but distinct. 1 *Hovenden on Frauds,* 471. 17 *Vesey,* 58. 1 *Ball and Beatty,* 285.

Mr. *Biddle,* in reply.

It is certain that this property was sold in 1817, to Langstroth, for $17,000. At the sheriff's sale, it produced less than half that sum. It was re-sold by them in a few months, at an advance of $3000. To fix a man with the character of a trustee, it is not necessary that the word *trust,* should be used. (4 *Dessauss. Rep.* 702.) In *Prevost* v. *Gratz,* there was a previous debt: Here the debt and trust were created together. In the case of *Delamater's estate,* the Court say that there was no trust as to the stock. It is conceded that there was no actual fraud on the part of the defendants; but we contend there was what is equivalent to it in law. We admit also, that a plaintiff may generally buy at a sheriff's sale, under his own execution; but that case has no analogy with this, because here are other rights besides those of the plaintiff and defendant. Suppose a sale for a grossly inadequate price. It would be the duty of a trustee, to move to set it aside; but where he buys, his interest is against this. It was the duty of the defendants, to give notice to the plaintiffs of this sale. It has been decided in this state, that where a loan is for an indefinite time, accompanied by a pledge as a security, the pawnee cannot sell without notice to the pawner. Here there was neither notice nor knowledge.

The opinion of the Court was delivered by

ROGERS, J.—When the trustee himself, becomes the purchaser of the trust estate, the *cestui que trust* may set aside the purchase. This equitable principle is recognised and enforced by Lord ELDON, in the case, *Ex parte Bennet*, (10 *Ves. jun.* 381,) and by Chancellor KENT, in *Davoue* v. *Fanning*, (2 *John. C. R.* 252,) who with his usual ability and legal research, has reviewed all the authorities having any bearing on the question. It has also received the sanction of this Court, in the lessee of *Lazarus* v. *Bryson*, (3 *Binn*. 54,) and the lessee of *Moody* v. *Vandyke*, (4 *Binn*. 43,) and in the case of *Black's Adm's* v. *Black*, decided at our last term at Sunbury, and not yet reported. The principle extends not only to a trustee, properly so called, but to judicial officers, and all other persons, who in any respect, have a concern in the disposition and sale of the property of others, whether the sale is public or private, judicial or otherwise. It is immaterial whether the sale was public or private, or for a *bona fide* price, for it is at the option of the *cestui que trust*, to avoid the sale, whenever the purchase has been made, in opposition to this salutary restriction. In addition to the cases referred to, these principles are supported by an unbroken current of authorities, most of which have been cited at the bar. It is, however, denied that they apply to a judicial sale. It was at one time doubted, whether they were applicable to a sale at auction, but it has been since held, that such sales come within the reason of the rule. 10 *Ves*. 381; 2 *Johns. C. R*. 252. The case of *Moody* v. *Vandyke*, was the case of an administrator who purchased the property sold by order of the Orphans' Court, which was public, and partakes of the nature of a judicial sale; and the case of *Lazarus* v. *Bryson*, (3 *Binn*. 39), was a judicial sale. The purchaser at the sheriff's sale, was the agent of the sheriff himself, and the counsel endeavoured, but without success, to distinguish it from the case of a trustee, who sells lands in pursuance of his trust, and himself becomes the purchaser. It was contended, that because the sheriff derived his authority from the law, the sale was good. But the Court were unable to comprehend the force of the distinction. *Black's Adm's* v. *Black*, decided at Sunbury, was also a judicial sale. The case was this: Two persons were the joint owners of a judgment; and the lands being sold on the judgment, one of them became the purchaser at the sheriff's sale, and took a deed to himself for the property, which he afterwards sold at an advance; and the Court decided, that the creditors of the other, were entitled to the one-half of the price for which the land sold. The principle has been adopted in Chancery, to prevent fraud, to avoid, as far as possible, even the temptation to commit fraud. The ground is, that though in this particular case, there may be the most satisfactory evidence, that the transaction amounts to no more than what the general interests of justice require,

yet the trustee shall not be permitted to purchase for himself or another; as in several cases, the powers of the Court would not be equal to protect it against deception, from the impossibility of knowing the truth in every case. To permit a trustee to bid, would be applying the information acquired by the trust, to their own benefit. In the case of *Ex parte Bennet*, (10 *Ves.* 385,) it was settled, that it was not necessary to show that the trustee had made any advantage by the purchase. If a trustee can buy in an honest case, he may in a case having that appearance, but which from the infirmity of human testimony, may be grossly otherwise; and yet the power of the Court would not be equal to detect the deception. Human infirmity will rarely permit a man to exert against himself, that providence which a vendor ought to exert, in order to sell the estate most advantageously for the *cestui que trust*, and which a purchaser is at liberty to exert for himself, in order to purchase at a lower price. These reasons apply with equal force, to private, public or judicial sales. When property is sold on a judgment or mortgage, and the trustee or agent, in that judgment or mortgage, purchases the property, the *cestui que trust*, or principal, as the case may be, is entitled to any benefit or advantage that may result from the purchase. It is necessary that this principle should be rigidly enforced, to protect the rights of persons so circumstanced; for otherwise, the temptation to fraud would be irresistible; and it is well known, that no Court is equal to the examination and ascertainment of the truth, in much the greater number of cases.

It remains now, to inquire whether this case is embraced within the principles stated. The agreement on which this controversy arises, is prolix, of course obscure, almost studiously so, but stript of its verbiage, it is in substance this. The Pennsylvania Company for insurances on lives and granting annuities, loaned to the plaintiffs, eight thousand dollars. To secure the repayment of the money, the plaintiffs, who were mortgagees, assigned the mortgage mentioned in the agreement, to the company. Upon the mortgage, ten thousand dollars remained to be paid in annual instalments, of one thousand dollars each, at an interest of six per cent. upon the whole amount, to be paid by the mortgagor annually. It may be fairly inferred from the terms of the agreement, that the defendants took the assignment of the mortgage and bonds, as a collateral security, for the repayment of the eight thousand dollars, and the interest, but with the understanding that they were not to resort to the plaintiffs for the payment, unless they were unable, after due and proper diligence, to recover it from the mortgagor. And this would appear to be the agreement, from that part of it which provides—that the said company shall have full power and authority, to extend, change and alter the day and time, upon all and any of the instalments, except only the two last instalments, which neither were, nor were intended to be assigned; and which further pro-

vides, that this amount shall be deemed, considered, and accounted for by the company, as if the same had been actually paid off, and discharged, at the day and time fixed and appointed, and that henceforth, the parties of the first part, to wit, the plaintiffs, or any of them, shall not in any way be liable for, or charged with any default or loss of the same, or any part thereof, or the interest thereon, afterwards accruing. From this clause, the implication is plain, that if the defendants gave no indulgence upon the bond or mortgage assigned to them, and used due diligence to collect the amount due, viz. $8000, but failed either in whole or in part, the plaintiffs would make good the deficiency. It is necessary that this construction should be given, for otherwise this clause is senseless and unmeaning.

It is also apparent that it was not the intention of the parties to pass any interest in the bonds and mortgages, beyond the first eight instalments, amounting to the sum of $8000, the sum loaned; nor was it intended to give the company any authority beyond what might be necessary to enforce the payment of such sum, unless they were empowered to receive the amount of the annual interest, as it became payable, or the whole amount of $10,000, which remained unpaid. This, the company were authorised to receive, and apportion between themselves and the plaintiffs, according to their respective interests. And this, from the account exhibited, was done, as long as the morgagor continued to pay the annual interest upon the whole amount due on the bonds.

That this was the agreement, appears from this consideration. Nothing is transferred to the company except what is expressly given to them for their own exclusive use and benefit. The words of the instrument are, " to have, hold, levy, take and receive, all and singular the sum and sums of money, hereditaments and premises, hereby granted and assigned, with the incidents and appurtenances thereunto belonging, or in any wise appertaining to the Pennsylvania Company for insurances on lives and granting annuities, aforesaid, their successors and assigns, forever." And it further appears, from the part of the agreement which declares, that " whenever the said company shall have received the full amount of the said sum of $8000, and the interest thereof, then and in such case, all the estate and interest, power and authority hereby given and granted, shall cease and determine." And also, from the clause in the agreement before referred to, which gives the company full power and authority to change all the times fixed for the payments at their pleasures, except the two last instalments, of $1000, with which they are not permitted to interfere.

If this be the fair import of the agreement, it is difficult to perceive any design to create a trust for the benefit of the plaintiffs. If we infer such an intention, it would be in contradiction to the terms

(Campbell *v.* The Pennsylvania Life Ins. Co.)

of the agreement, which was merely intended to transfer the mortgage and bonds, for the proper use and benefit of the company.

To permit the plaintiffs to recover would be contrary to the spirit, as well as the letter of the agreement. For with the exception of the excess of interest beyond the $8000, payable annually upon the whole amount, they were not bound to pay over on account to the plaintiffs, for any sum received by them, until they had actually received or recovered from the obligor, the full amount of $8000, with the interest. If they had received incidentally more, they were to pay the surplus to the plaintiffs. The words of the agreement are, " that whenever the company shall have received the full amount of $8000, and the interest, that then and in such case, all the estate and interest, power and authority, given and granted, shall cease and determine; and if there shall then be in their possession any balance or *surplus*, that the company will, upon demand, pay over, or otherwise appropriate the same, as before mentioned." And then follows an engagement upon the part of the obligees and mortgagees, to give a preference to the defendants, in purchasing the last instalments. And it is agreed, that if the company do not purchase, they will not, in any way interfere with, or impede the recovery thereof, but will, upon demand, assign and reconvey same to the said plaintiffs, according to their respective interests. The company are not accountable for any money which they shall receive on account of the bond and mortgage, unless for a surplus, recovered from the obligor, beyond the $8000, and interest. But it is not pretended that they have received any surplus, nor even the amount of the $8000, with the interest. But this part of the agreement also shows, that the company were not entrusted with the collection of the last instalment. Instead of being so entrusted, they are expressly prohibited by the agreement, if they did not purchase, in any way to interfere with, or impede the recovery; but upon receiving or recovering from the obligor or the mortgagor the $8000 and interest, they are required to assign and reconvey, upon demand, the bonds and mortgage to the plaintiffs, and according to the respective interests. The plaintiffs, therefore, not having parted with the right to the $2000, mentioned in the agreement, nor authorised the company to collect it, must have intended to reserve that right to themselves; and hence the insertion of the provision to prevent the company interfering or impeding them in the recovery of the amount due them on the mortgage.

If this be the fair construction of the agreement, there is no pretence to say, that there was any special trust and confidence reposed by the plaintiffs in the company, so far as respected the $10,000, the two last instalments of which belonged to the plaintiffs. The company were only bound to take care of their own interest, leaving to the plaintiffs the protection of their own; for there can be no doubt, that a judgment or mortgage creditor may purchase in the

(Campbell *v.* Pennsylvania Life Ins. Co.)

property of his debtor. It offends no rule of public policy to permit him to bid at such a sale ; on the contrary, it would be against the interest of the debtor to restrict or impair this right.

KENNEDY, J.—The transaction which gave rise to the controversy here, when stripped of all unnecessary verbiage introduced into the agreement between the parties, was simply a loan of eight thousand dollars by the defendants to the plaintiffs, to secure the repayment of which the latter assigned the mortgage and bonds, mentioned in the agreement, upon which ten thousand dollars remained to be paid thereafter by annual instalments, with an interest of six *per cent.* upon the whole amount thereof, to be paid by the mortgagor or obligor annually. From the terms of the agreement, it is fairly to be inferred, that the defendants took the assignment of the mortgage and bonds merely as a collateral security for the repayment of the eight thousand dollars with interest thereon ; but not to resort to the plaintiffs for the payment thereof, unless so far as they should be unable to recover the same or any part thereof upon the mortgage and bonds, after using reasonable diligence for that purpose. That such was the understanding and intention of the parties, is perfectly manifest from that part of the agreement, which provides "that the said company, (the defendants,) shall have full power and authority to extend, change, and alter the day and time upon all or any of the said instalments, (meaning the instalments mentioned in the mortgage,) excepting, only the said last instalments, (meaning the two instalments which became last payable by the terms of the bonds and mortgage, and were not intended to be assigned by the plaintiffs to the defendants,) are by the conditions of the said obligations, respectively made payable, but that then, and in every such case, the amount thereof shall be deemed, considered and accounted for by the said company, (defendants,) as if the same had been actually paid off and discharged at the day and time fixed and appointed therefor ; and that thenceforth the said *parties of the first part,* (meaning the plaintiffs,) *or any of them, shall not in any way be liable for, or charged with any default or loss of the same or any part thereof, or the interest thereon afterwards accruing :*" thus implying most clearly, that if the defendants gave no indulgence upon the bonds and mortgage, for the eight thousand dollars coming to them, and used due diligence by means thereof, to collect the same with interest, but failed therein, from the inability of the obligor to pay, and the insufficiency of the mortgaged premises to produce the amount upon a judicial sale thereof to be made, then the plaintiffs should make good the loss or deficiency. If this were not the true meaning and agreement of the parties, the clause recited ought not to have been introduced, but rather one of a directly opposite tendency.

It is also obvious from the terms of the agreement, that it was not intended to pass to the defendants any interest in the bonds and mortgage beyond the eight thousand dollars, that should become first payable thereon with its interest; nor yet to give them any authority beyond what might become necessary to enforce the payment thereof, unless it were to receive the amount of the annual interest as it became payable on the whole amount of the debt still remaining unpaid on the bonds and mortgage, which the defendants were authorised to receive and apportion between themselves and the plaintiffs, according to their respective interests in the bonds and mortgage; and this, it would appear from the account exhibited by the defendants, they did as long as the obligor continued to pay up regularly the interest annually upon the whole amount of the debt due upon his bonds.

That it was the intention of the parties that nothing should pass to the defendants beyond the eight thousand dollars, appears by the agreement between them in several parts thereof; first, from the circumstance that nothing is thereby transferred to them, except what is expressly given to them *for their own exclusive use and benefit.* The words of the *habendum* are, "to have, hold, levy, take and receive all and singular the sum and sums of money, hereditaments and premises *hereby granted* and *assigned,* with the incidents and appurtenances thereunto belonging, or in anywise appertaining, to the Pennsylvania Company for insurances on lives and granting annuities aforesaid to the *only proper use, benefit, and behoof of the Pennsylvania Company, for insurances on lives and granting annuities aforesaid, their successors and assigns forever.*" And secondly, from that portion of the agreement which declares, "that whenever the said company, (the defendants,) shall have received the full amount of the said sum of *eight thousand dollars,* and the *interest thereof,* that then and in such case all the *estate,* and *interest, power,* and *authority hereby given and granted, shall cease and determine.*" And thirdly, from the clause of the agreement first recited above, giving the defendants full power and authority over all the instalments, to change and alter the times fixed for the payment thereof at pleasure, excepting the two last of one thousand dollars each, with which they were not to interfere.

Having thus shown from the agreement itself of the parties, the real character of the transaction between them, can it be pretended that the object or design thereof was to create a trust for the benefit of the plaintiffs? or is it not perfectly manifest that they thereby only intended to show that the plaintiffs were debtors to the defendants in the sum of eight thousand dollars, for that amount of money borrowed of them, and that the plaintiffs had thereby given to the defendants a security for the repayment of the same with a guaranty of its goodness. To raise a trust in favour of the plaintiffs, would be to contradict the express and positive terms of the agreement,

(Campbell *v.* Philadelphia Life Ins. Co.)

which, as we have already seen, transferred the bonds and mortgage to the defendants for their own proper use, benefit, and behoof. Every mortgagee, it seems to me, might with the same, if not with much more propriety, be considered a trustee for his mortgagor, and held bound by all the rules, which have been established for regulating the conduct of a trustee and protecting the interests of his *cestui que trust.* But no one ever imagined that a mortgagee could not buy the mortgaged premises at a judicial sale made at his own suit upon the mortgage, and again make a resale thereof for four times the price he bought it for at the sheriff's sale, and twice as much as the amount of the mortgage debt, without being accountable to the mortgagor for any portion of the advance obtained upon the resale.

To permit the plaintiffs to recover here, would not only be contrary to the express letter of their agreement, but to the whole tenor, spirit and meaning of it; for with the exception of the excess of the interest beyond that of the eight thousand dollars, becoming payable annually upon the entire amount of the debt due from Langstroth, the obligor, upon his bonds and mortgage, which the defendants were authorised to receive as already mentioned, unless they received it as it became payable from him, they were not bound to pay over or to account to the plaintiffs for a cent received by them, either directly or indirectly, until they had received or recovered first from the obligor upon the bonds or mortgage, the full amount of their eight thousand dollars with the interest thereof; and having received this, if it should be that they had incidently received more from the obligor in any way, then they were to pay the surplus to the plaintiffs. The words of the agreement in respect to this are, "that whenever the said company (defendants,) shall have received the full amount of the said sum of eight thousand dollars and the interest thereof, that then and in such case all the estate and interest, power and authority, hereby given and granted, shall cease and determine; and if there shall then be in their possession any balance and *surplus,* that they will upon demand pay over or otherwise appropriate the same as is above mentioned," (meaning as the plaintiffs and Robert Campbell, the obligees and mortgagees named in the bonds and mortgage, should direct;) and then follows an engagement upon the part of the obligees and mortgagees, to give a preference to the defendants in purchasing the last instalments mentioned in the bonds, if they should thereafter wish to do so; after which it is thus agreed; "but if they shall not purchase the same, that they will not in any way interfere with or impede the recovery thereof, but will upon demand assign and reconvey the same to the said parties of the first part, according to their respective interests;" whence it appears most distinctly that the defendants were not to be accountable to the plaintiffs for any moneys which they should receive on account of the bonds and mortgage or by

means thereof, unless for a surplus received or recovered from the obligor beyond the eight thousand dollars, and the interest thereof; but it is not pretented that they have received or recovered from the obligor or his estate any such surplus, nor even the amount of their eight thousand dollars including the interest due thereon; and hence the plaintiffs, according to the terms of their agreement, have no right to recover.

Besides, it is not claimed, nor indeed could it be, consistently with the agreement, that the plaintiffs have any right to demand a re-assignment of the bonds, as the defendants have not yet recovered from the obligor, the amount of their eight thousand dollars with interest, then how can it be, that the plaintiffs are entitled to recover the last instalments, which are what is claimed here, from the defendants, without being entitled to the bonds? This would be clearly in direct contradiction to the express terms of the agreement; and involve the absurdity of the plaintiffs being entitled to recover these last instalments from the defendants, without their having been paid them, either directly or indirectly, by the obligor; or even a right on the part of the plaintiffs, to have demanded them of the obligor; for until the obligor shall have paid the eight thousand dollars, and the interest thereof to the defendants, the plaintiffs according to the agreement, can have no right to either the bonds or the mortgage; nor yet to receive any money thereon, from the obligor.

But those parts of the agreement recited last, show also very clearly, that the defendants were not thereby entrusted with the collection of the last instalments mentioned in the bonds, amounting to two thousand dollars, and which the plaintiffs now attempt to make the defendants accountable for, without their ever having received any part thereof; and even without its being alleged, that they have received the same, or any part thereof, either from the obligor himself, or from any judicial sale made of his property. If the defendants then were not entrusted with the collection of these two thousand dollars, and never have received the same or any part thereof, either from the obligor or his estate, or from any one paying it for him, and it is not pretended that they have, it is truly difficult to conceive upon what principle of either trust or obligation of any kind, the plaintiffs can claim to recover. The defendants, instead of being entrusted with the collection of the money claimed by the plaintiffs, are expressly required by the terms of the agreement, if they did not purchase the plaintiffs' right to it, " not in any way to interfere with, or impede the recovery thereof, but upon receiving or recovering from the obligor or the mortgagor, their eight thousand dollars, and the interest thereof, to assign and reconvey upon demand, the bonds and mortgage to the plaintiffs, and the parties of the first part in the agreement named, according to their respective interests;" so that the plaintiffs not having parted with

(Campbell *v.* Pennsylvania Life Ins. Co.)

their right to the last two thousand dollars mentioned in the bonds and mortgage, nor authorised the defendants to receive and collect the same, must have intended doing it themselves, and therefore made provision accordingly, in the agreement, so as to prevent the interference of the defendants with their doing so.

From the view here taken of the original transaction between the parties, and the agreement founded thereon, the defendants cannot, I apprehend, be considered with any propriety, as having acted in the character of trustees, when they prosecuted the suit upon the mortgage, and after having obtained an award of execution therein, against the mortgaged premises, caused the same to be exposed to sale by the sheriff, whereat they became the purchasers, for seven thousand dollars, that sum being the highest and best price bidden. In doing all this, they must be regarded as having proceeded merely for the purpose of recovering the eight thousand dollars, which was coming to themselves, for their own exclusive use and benefit. This they certainly had a right to do, as the assignees of the plaintiffs, and had, as we have seen, an express authority irrevocable from them, for that purpose. And in order to effect this object, by suit upon the bonds and the mortgage, or upon either, it is obvious from the terms of the agreement, as well as perfectly manifest, that such was the understanding of the parties, that the defendants should be invested with all the rights and privileges of the plaintiffs. If the plaintiffs then had not assigned and parted with their rights in this respect, but having retained them, had proceeded on the mortgage as the defendants did, it cannot be questioned but they would have had an undoubted right or privilege, to have bought the mortgaged premises at the sheriff's sale, for the same price that the defendants did, or for any less sum, provided it were the highest and best price bidden therefor; and to have resold the property immediately afterwards, if they could, for double the amount of the whole mortgage debt remaining unpaid, and to have pocketed the advance, without accounting to the mortgagor, or to any other, for a cent of it. Then why should not the defendants, who by the agreement, stood in the shoes of the plaintiffs, invested with all their rights, and the most unlimited powers that could be given for the purpose of recovering the eight thousand dollars, and the interest thereof, from the obligor, either upon the bonds or mortgage, be entitled to claim the same privilege and right of purchasing at the sheriff's sale? Certainly, not because it would militate against any thing expressed in the agreement; nor yet, as I can conceive against any thing that can be fairly implied from it. For the assignment is absolute and unqualified, as to the eight thousand dollars; accompanied also by an investiture of powers to collect the same for their own use, that were to be irrevocable, and to be exercised in as full and ample a manner as the plaintiffs themselves could have done, had they not made the assignment, and

been collecting the money for their own use; or as if they had been personally present assenting thereto. It is therefore difficult to imagine how it is possible to infer from the agreement, that it was intended by the parties, that the defendants should not become purchasers in the same manner as the plaintiffs or as strangers might, of the mortgaged premises, or of any other portion of the mortgagor's estate, that might have become necessary to be sold at their suit, by the sheriff, for the purpose of recovering the debt due to them. Such right on the part of the creditor to purchase the property of his debtor at a judicial sale thereof, caused by himself, is a right that is common, and belongs to every creditor; and one of which he cannot be deprived, excepting by his own consent clearly expressed. For unless clearly assented to, it ought not to be taken from him, because to have his hands tied up in this respect, might delay and embarrass him very much in the collection of his debt; or still worse, might cause him to lose less or more of it altogether: because it not unfrequently happens, that the only mode by which a creditor can secure and obtain payment of his debt, when no one beside himself, is willing to buy the property of his debtor at sheriff's sale, for a fair price, which is only too often the case, if it could be avoided, is to purchase it in himself, and after having improved it a little perhaps, or divided it into two or more parts, to make a resale thereof upon credit, for an amount of money sufficient to cover his claim.

And here it must be observed, and borne in mind too, that the plaintiffs as well as the mortgagor stood in the relation of debtors to the defendants, and were bound for the payment of the debt which the latter were endeavouring to levy from the property of the mortgagor by a judicial proceeding and sale thereof. The plaintiffs, as I have said, were the debtors of the defendants and could not be looked upon as having a joint interest with them in the bonds and mortgage by virtue of the assignment thereof: nor could they be considered as standing in the relation of tenants in common as to the bonds and mortgage, although this has been alleged. For by the import of the agreement they were not entitled to claim any thing upon either the bonds or the mortgage until the defendants obtained therefrom their eight thousand dollars with the interest due thereon; and unless the obligor and the mortgage proved sufficient for the payment of this amount, the plaintiffs were to have no right whatever to any thing that might be recovered therefrom: but on the contrary, were to be liable to the defendants for any deficit there might be in recovering from the obligor the amount due to the latter. To hold, therefore, that the defendants purchased the mortgaged property in trust for the plaintiffs, and became liable to them for any surplus made by the resale beyond the amount of their debt and the interest thereof, would, in effect, be deciding that the assignor of a judgment, bond, note or other security for the payment of

money, who has guaranteed the payment of it to his assignee, in case the latter should prosecute the debtor to legal insolvency, without being able to obtain payment in full, would not be liable on his guaranty where the assignee has so prosecuted the debtor and made one half of the debt by a judicial sale of all the debtor's property, which the assignee buys himself and immediately sells again for a sum of money sufficient to cover the whole amount of the debt. But no one will pretend to say, that the assignor would not be liable in such case upon his guaranty for the residue of the debt remaining unpaid, after deducting the amount of the sheriff's sale. Yet it might be argued with as much force and with the same propriety, as it has been done in this case, that the assignee was bound to do the best he could for the assignor, in order to save him from loss and liability as much as possible; and because he did not give to the assignor a special notice, previously, of the time and place appointed for the sheriff's sale, so that the assignor might have purchased the property if he had pleased, and thus have endeavoured to save himself by a resale of it, that he therefore ought to credit the assignor with the advance upon the resale, and in this way balance the account and extinguish his claim upon the guaranty. But suppose that no resale had been made in this case, and that Langstroth had been proceeded against upon his bonds with all due diligence by the defendants to insolvency, without any thing having been made or obtained, except the seven thousand dollars, for which the mortgaged property was sold; and the defendants had then sued the plaintiffs upon their guaranty for the deficiency of their debt, upon what principle could it have been maintained that the plaintiffs would not have been liable and bound to pay it? They in such case would certainly have a right to claim a credit for all that had been paid by Langstroth himself and for whatever had been made by a judicial sale of his property, but beyond this they could have no right to claim any thing more than Langstroth himself could; for by the very nature and terms of their guaranty they were to make good and to pay all that the defendants had a right under the assignment to demand and receive from Langstroth in satisfaction of the money loaned to the plaintiffs, which Langstroth was or should become unable and failed to pay. This would seem to be a perfectly fair and equal measure of justice. as regards the plaintiffs, unless they were willing to admit, what they deny, that under the agreement they would have been bound to have made good to the defendants any loss that might have accrued from their inability to obtain a price, upon a resale of the property, equal to what they bought at.

It is unnecessary to notice the cases cited and referred to by the counsel in argument on the subject of trusts; and especially those which evidence the scrupulous jealousy with which the law scans and judges of the conduct of trustees; because they are conceived

(Campbell *v.* The Pennsylvania Life Ins. Co.)

to be inapplicable here.  The principles by which the conduct of a trustee is to be governed so as to secure to his *cestui que trust* all the benefits and advantages which may be obtained or derived from a faithful execution of the trust, are pretty well defined and established : and doubtless the law will not permit a mere trustee to become the purchaser of the trust property, even at a judicial sale, though perfectly fair, without the assent of his *cestui que trust,* or giving to him the benefit of it ; if it be caused by the trustee and be such as he may control in any way ; as for instance, by countermanding the order therefor after he has caused it to be sued out ; and again by renewing it at his pleasure, when he may think the prospect of competion at the sale has diminished, and he may therefore have a chance of buying at a less price than before.  But it is clear that in the present case the relationship of *cestui que trust* and trustee never did exist between the parties.  To constitute a valid trust there must be three things ; sufficient words to raise it ; a definite subject ; and a certain or ascertained object.  *Cruwys* v. *Colman,* (9 *Ves.* 323.) 2 *Story on Eq.* 230-1.  But here I have shown that the first thing, the words, are wanting.  The agreement shows that the relationship of creditor and debtor was created instead of trustee and *cestui que trust ;* and that the proceeding on the part of the defendants was such as was authorised under the agreement and carried on and conducted by them solely for the purpose of recovering the sum due to them.  I am therefore of opinion that judgment ought to be rendered for the defendants.

Judgment for the defendants.