# Fisk *against* Sarber.

The assignee of an insolvent debtor is not incapable, by reason of his fiduciary character, of becoming the purchaser of the debtor's real estate when sold by the sheriff upon a mortgage which encumbered it before the time of the assignment.

**ERROR** to the District Court of *Allegheny* county.

John Sarber against D. D. Fisk and Fanny Fisk, administrators of Alba Fisk, deceased. The facts and evidence in this cause, which the parties agreed to consider in the nature of a special verdict, were voluminous, and presented several points; but the whole case was ultimately brought to the single point, whether the assignee of an insolvent debtor could, by reason of his fiduciary character, become the purchaser at sheriff's sale of the debtor's real estate, when sold by the sheriff upon a mortgage which encumbered it previous to the date of the assignment and the debtor's insolvent discharge. The court below was of opinion that he could not, and directed a judgment for the plaintiff. The same point was argued here by:

*Williams*, for the plaintiff in error, who cited 4 *Watts & Serg.* 149; 2 *Whart.* 53; *Peters's C. C. Rep.* 364; 3 *Sugd. Vend.* 237; 2 *Bro. C. C.* 400; 10 *Vez.* 381; 6 *Vez.* 617; *Peters's C. C. Rep.* 335; 8 *Wheat.* 441; 3 *Wend.* 515; 14 *Serg. & Rawle* 357; 9 *Paige* 238; 3 *Wend.* 515.

*M'Candless* and *Dunlop*, contra, cited 2 *Johns. Chan.* 259; 1 *Stor. Eq.* 317; 12 *Peters* 24; 3 *Vez.* 740; 1 *Ash.* 311; 7 *Watts* 413; 4 *Binn.* 43; 7 *Serg. & Rawle* 230; 7 *Watts* 472; 3 *P. Wms.* 251; 4 *Eng. Con. Chan.* 320; 5 *Watts* 303; 3 *Wend.* 515–16; 2 *Johns. Chan.* 269; 9 *Lond. Jurist* 18; 2 *Whart.* 63; 4 *Cow.* 744.

The opinion of the Court was delivered by

KENNEDY, J. — The facts of the case are presented in a statement made by the parties, and by them to be considered in the nature of a special verdict. From this statement it appears that Abraham R. Woolley, in 1823, was discharged under the Insolvent Laws of this State, and Alba Fisk, the intestate of the plaintiffs in error, who were the defendants below, in conjunction with John Sarber, the defendant in error and plaintiff below, were appointed assignees, and gave bond, with sureties, in the sum of $1500, conditioned for the faithful discharge of their duty as such assignees. Among the property returned by A. R. Woolley, in his schedule, was a farm No. 6, situated in the vicinity of Pittsburgh, valued

[Fisk v. Sarber.]

therein by him at $8700.  This farm was subject to a mortgage, previously given by Woolley to the Bank of the United States, as a security for the payment of $4750, and not $3500, as stated in the opinion of his honour, the President Judge of the District Court.  Though Woolley, in his schedule, values the farm at $8700, it is very clear from the case as stated, that it was not considered worth even the amount of the mortgage-debt, and that that sum of money could at no time have been obtained for it, until after it was purchased by Alba Fisk at the sheriff's sale under the mortgage, made upon judicial process sued out at the suit of the bank upon a judgment obtained. on the mortgage.  His honour, also, seems to have fallen into an error, in assuming that Fisk, while in possession of the farm, before the sheriff's sale, at the instigation of Woolley, under some private arrangement with him as to the division of the profits, made an agreement with the bank whereby the bank was to sell. the farm under the mortgage, he (Fisk) to become the purchaser of it, and to give his personal engagement, beside a mortgage on the farm, as a security for the payment of the bank-debt; and afterwards, as he (Fisk) should make sales of any parts of the farm, the bank was to release their mortgage *pro tanto*, on receiving the proceeds of such sales, until their whole claim was paid.  This arrangement, says the Judge, was carried into execution in the spring of 1830, and the property or farm was set up at sheriff's sale, knocked down to Fisk, and a deed made to him by the sheriff.  Now although a proposition was made in June 1828, by Mr Fisk, in his own name, at the instance of Major Woolley, who was to furnish the money for the purpose of carrying it into effect, to pay the bank $4750, the amount of the principal of the mortgage-debt coming to it, as follows—$1000 thereof to be paid on the 1st of September then next ensuing, $1750 thereof in the course of the year 1829, to be divided into four equal payments, and the remaining $2000 in three years, with interest—yet this proposition, notwithstanding it is stated to have been acceded to by the bank, and an extract of the minutes of the bank referred to for the purpose of showing that it was so; yet the minutes show nothing of the kind.  From them it does not appear that the proposition was ever decided or acted upon by the bank; and most probably so, because Major Woolley seems to have failed entirely in raising the money, as he proposed, without which it could not be carried into effect.  The matter then lay over until December 1829, a space of eighteen months, without anything being done towards paying or satisfying the debt of the bank, when the bank, of their own mere motion, as it appears, resolved to proceed and have a sale made by the sheriff, of the farm, if practicable, under their mortgage, and directed that their attorney should be instructed to bid it up to $4500; but in the event of no person bidding above that sum, that he should cause the sale to be adjourned; and that if Alba Fisk should become the purchaser at

the sale for a sum exceeding $4500, the bank would extend the time of payment for five years from the 1st of April then next ensuing, upon his giving his promissory note for the amount of the purchase money, including the costs of sale, bearing date the said 1st of April, payable at ninety days after date, interest to be paid in advance, and to be renewed (interest being paid) every ninety days for five years, if required, for such balance as should from time to time remain due; and the whole to be secured by a mortgage to be given on the premises or farm cotemporaneously with the sheriff's deed.

The bank also further resolved, that on the purchaser's complying with these terms, they would assign to him their mortgage and judgment, and release the said A. R. Woolley from the balance of said mortgage and judgment. And that Alba Fisk, if he became the purchaser, might proceed to sell, from time to time, parcels of said farm or land, and pay the avails thereof, as they should be realized, to the bank, and the bank, upon such payments being made, would release the parcel or parcels so sold, from the operation of their mortgage. The attorney of the bank was accordingly instructed to have a sale made of the mortgage-premises by the sheriff; which was effected under a writ of *levari facias,* to him directed for that purpose, on the 15th of March 1830, to Alba Fisk, for the sum of $4510, he being the highest bidder, and that the highest sum or price bidden for the same. On the 26th of April following the sheriff consummated his sale by executing and acknowledging a deed of conveyance to Alba Fisk for the farm, who gave his note and mortgage to the bank for the amount of the purchase money, securing the payment thereof in the manner that the bank had proposed anterior to the sale. Fisk, therefore, does not appear to have entered into any arrangement with the bank anterior to the sale, by which he was to become the purchaser or even a bidder at it. For aught that appears, he was at liberty to bid or not, as he pleased; but if he did become the purchaser, he had the assurance of the bank that indulgence would be given him, if he required it, to enable him the more conveniently to pay the purchase money which would be coming to the bank. The bank, evidently not considering the farm worth the amount of the debt coming to them, did this for the purpose of getting as much of it as possible, by giving up $250 of the principal, beside a considerable amount of interest which had become due. Neither does any arrangement appear to have been made between Fisk and Woolley, whereby the latter was to participate in the purchase, or derive any benefit from it. The whole risk and responsibility of making the purchase and paying the money for it would appear to have been taken by Fisk upon himself. Woolley does not appear to have ever paid a dollar, or to have bound himself to Fisk to do so on account of the purchase, in any event that might happen. The sale, also, by the sheriff to Fisk appears to have

[Fisk v. Sarber.]

been perfectly fair; so that the great question raised in the case, and the only one that need be decided, under. the view taken of it by this court, is, whether Fisk, being one of the assignees of Woolley under the Insolvent Laws of this State, had a right to purchase the farm at the sheriff's sale for his own use, and hold it, as the absolute owner thereof. Before entering on the discussion of this question, it may be proper, however, to observe, from the case as stated, that the sheriff's sale of the farm was not occasioned, or did not arise from any neglect on the part of Fisk to perform his duty as a trustee under the assignment for the creditors. of Woolley. It was not his fault that the mortgage-debt owing to the bank was not paid, which made it necessary for the bank to proceed upon their mortgage, so as to have the farm sold by the sheriff, for he never had trust-funds in his hands, of sufficient amount, or anything near it, to have satisfied it; and even if he had, it would have been perilous and improper in him to have appropriated them to that end, without paying the other debts of Major Woolley, because the mortgaged premises were not considered equal in value to the amount of the debt mentioned in the mortgage; and the sheriff's sale, with all the aid and inducement that the bank could give, with a view to encourage bidders and to obtain the highest possible price for them, prove fully the inadequacy of their value for that purpose.

Now that a trustee or person acting in a fiduciary character, for the benefit of others, cannot become a purchaser at his own sale, or acquire an interest therein, without the consent of those for whose benefit he has undertaken to act, is a principle too well established to admit of the least doubt. His own interest, in such case, being generally opposed to that of those for whom he is a trustee, would, were he permitted to consult it and act accordingly, almost necessarily, owing to the weakness and infirmity of human nature, interfere with a faithful discharge of his duty to those for whom he had undertaken to act. The maxim, in this respect, is, *emptor emit quam minimo potest, venditor vendit quam maximo potest.* The chancery doctrine, in England, establishing this principle, has received the approbation and sanction of this court, and been acted upon frequently; 3 *Binn.* 54; 4 *Binn.* 43; *Leisenring* v. *Black*, (5 *Watts* 304); *M'Ginn* v. *Shaeffer*, (7 *Watts* 415); *Campbell* v. *Pennsylvania Life Ins. Co.*, (2 *Whart.* 53); *Rankin* v. *Porter*, (7 *Watts* 390); also in the Circuit Court of the United States in this State; *Prevost* v. *Gratz*, (*Peters's C. C. Rep.* 373). A purchase, however, by a trustee, is not absolutely void, but voidable merely at the election of the *cestui que trust*, or those beneficially interested in the estate; so that the trustee takes the property subject to the equity of the *cestui que trust* to call upon him within a reasonable time, to account for the profits, or have a re-sale. *Prevost* v. *Gratz*, (*Peters's C. C. Rep.* 373); *Leisenring* v. *Black*, (5 *Watts* 304); *Whichcote* v. *Lawrence*, (3. *Vez.* 740);

[Fisk v. Sarber.]

*Campbell* v. *Walker*, (5 *Vez.* 678, 13 *Vez.* 601) ; 4 *Kent's Com.* 438. The principle that a trustee, properly so called, cannot purchase 'or acquire an interest in the property for himself at a sale made by him, in execution of the trust, extends to judicial officers and all others, who, in any respects, have a concern in the disposition and sale of the property belonging to other persons; and it is immaterial whether the sale is public or private, judicial or otherwise, or for a *bonâ fide* price. *Campbell* v. *Penns. Life Ins. Co.,* (2 *Whart.* 53.) I would also refer here to *Davoue* v. *Fanning,* (2 *Johns. Ch. Rep.* 252), where Chancellor KENT, with his usual industry and ability, has stated the most, if not all the English cases on this subject, down to and during part of the time of Lord ELDON, showing very clearly and distinctly that the doctrine, as laid down above, is the same which seems to be fully established there at the present day. But it is also equally well settled in England, as also by our own decisions, that trustees and others acting under authority conferred upon them for the benefit of others, are only restrained or incapacitated from buying absolutely for themselves, as long as the trust or the authority in regard to the property sold continues to exist, and until notice is given of its having terminated, especially where the trustee devests himself of the trust or authority by his own act, to those beneficially interested in the property. *Campbell* v. *Walker,* (5 *Vez* 678, 13 *Vez.* 601); *Ex parte Bennett,* (10 *Vez.* 393–4); *Davoue* v. *Fanning,* (2 *Johns. Chan. Rep.* 261); *Bartholemew* v. *Leech,* (7 *Watts* 472). There are cases, in which the party acting in a fiduciary character may, by his own act, devest or discharge himself of the power or trust under which he has acted, at pleasure; but then he will not be permitted to act for his own benefit, in opposition to the interests of those for whom he had previously undertaken to act in the matter, without making known to them the fact of his having relinquished his trust or authority to act for them. *Bartholemew* v. *Leech,* (7 *Watts* 472). But where he cannot by an act of his own will discharge himself of the trust, so as to enable him to become a purchaser of the trust property, a Court of Chancery, under particular circumstances, will devest him of his character of trustee, and thus enable him, by appointing another to make the sale, to buy and become a purchaser at it for his own use; *Campbell* v. *Walker,* (5 *Vez.* 681) ; or the trust property may be taken out of his hands, and all his authority over it put an end to by the interposition and act of the law, as was really done in this case. *Prevost* v. *Gratz,* (*Peters's C. C. Rep.* 378). There the late Mr Justice WASHINGTON says; " I know of no principle of equity which will invalidate the title of a trustee to land which the law has taken out of his hands, and which he purchased from one appointed by the same authority to sell it. This," as he further says, " is precisely like the case of an executor who purchases at a sheriff's sale .the personal property of his testator, seized and sold

[Fisk v. Sarber.]

under execution. The reasons which forbid a trustee from pur-chasing the trust property where he himself is the seller, do not apply to such a case." The case there was, that Gratz, the trustee, had purchased a tract of land included in the deed of trust to him, at a subsequent sheriff's sale made under the judgment and exe-cution of one Spears against the grantor in the deed of trust, upon which he had made a profit by a re-sale, and the claim of the plaintiff was for the profit thus made; but the court held him not entitled to it.

If this decision of Justice Washington be correct, it settles the present case in favour of the plaintiffs in error, and against the defendant in error. That it is correct, and sustainable upon the ground of reason, as well as the authority of analogous cases, can, in my humble opinion, be shown pretty clearly. Where the debt for which the property in such cases is taken in execution, is just, and the property liable to the payment of it, and the trustee with-out funds in his hands, or power to pay it, so as to relieve the property, what can he do? He is certainly not required to ad-vance moneys out of his own pocket for the purpose of redeeming it; and it being taken out of his possession, as it were, and cer-tainly out of his power, by the authority of the law, which is paramount to any that he has as trustee, and placed in the hands of the officer of the law, to whom full power is given to sell and dispose of the same, it is perfectly manifest that he thereby be-comes devested of his trusteeship in regard to it; that all his power and control over it cease; so that he has no duty whatever to perform in respect to it in the slightest degree incompatible with his buying at the lowest price for which it may be obtained; and as to the sale to be made by the sheriff, it is impossible to conceive how the trustee can exercise any control or influence over it to the prejudice of those whose interest it is to have the property sold for the highest possible price, that any other individual disposed to buy may not exert. I have said already that it is not even his duty to attend the sheriff's sale in such case, or to give any atten-tion to it whatever, because if it be, he would be entitled to claim compensation for his doing so; but where there is no other trust property than that sold by the sheriff, which does not sell for a price sufficient to satisfy the execution and lien creditor, it will scarcely be pretended that the trustee would be entitled to receive compensation for his trouble in attending the sheriff's sale, out of the moneys arising from it in the hands of the sheriff, to the pre-judice of the lien creditor. He is not known or recognised as having any agency in effecting the sheriff's sale, and therefore cannot claim any compensation on account of it; but the sheriff, who is considered the sole and only agent for making the sale, is entitled to be paid his fees or compensation for his trouble, out of the money arising from the sale, before the execution-creditor can receive any portion of it. But it is objected that the trustee, in

[Fisk v. Sarber.]

such case, may collude with the execution-creditor, and perhaps the sheriff too, so as to buy the property at an under-value, or reduced price; and hence public policy requires that he should not be permitted to become an absolute purchaser of the property for his own benefit. This, to be sure, is a most sweeping objection, and would go to exclude every other person from buying for his own use; for the trustee has no means of influencing the execution-creditor or the sheriff to do anything improper in regard to the sale, that any other person may not be possessed of; and if he does exert an influence of the kind successfully, there is no reason why it cannot be as easily discovered as if exerted by any other; so that there is not, as it appears to me, the least show of reason for this objection.

Another objection is, that from his connection with the property as trustee, he may have acquired a knowledge of secret and valuable properties belonging to it, calculated to enhance the value of it in the estimation of those who may be disposed to buy; and therefore public policy demands that he should not be induced to suppress his knowledge in this respect, if he has any, by becoming a purchaser at the sheriff's sale absolutely for his own benefit. It may be that there is some plausibility in this objection; but then it must be observed that it is founded on the assumption *that it is* the duty of the trustee to attend the sheriff's sale, and make such properties, if they exist in his knowledge, known to bidders, and those generally attending the sale, though he cannot claim and receive any compensation for doing so. It is obvious such a requisition on the trustee would therefore be unreasonable and unjust, and can or ought not to be exacted. But Courts of Chancery have never regarded this objection as being, at most, entitled to the same weight that is attempted to be given to it here. For if it were to be regarded as valid, it would even prevent a trustee from becoming a purchaser of property of which he had been the trustee under an order of the court granting him leave to buy; or rather, it would prevent Courts of Chancery, in all cases, from ever granting such leave. But it is the constant practice of a Court of Chancery to grant such leave, where the trustee evinces a disposition to give a higher price for the property than any other seems willing to give; and yet this disposition to give a higher price than any other, may, for aught that appears to the court, proceed from his knowledge of valuable properties belonging to the estate, that is known to nobody excepting himself. Such matter is never inquired into by the court; and the non-existence of any such knowledge on the part of the trustee, does not appear to enter into the consideration of the court, in making an order authorizing him to become a purchaser, if disposed to give the highest price. *Campbell* v. *Walker*, (5 *Vez.* 678, 681.)

In practice, therefore, this second objection seems to have no weight or validity attached to it. It will not be pretended, I

presume, that a trustee, who is constituted such for the purpose of selling and disposing of an estate, is bound to suppress or keep secret, in doing so, any defects which he may discover in the title to it, or secret bad properties belonging to the estate itself. Truth, which is the basis of all moral excellence and fair dealing between man and man, would rather seem to require that he should disclose them in the course of a sale made by himself; but certainly, when the sale and trust are taken out of his hands, he would not be required to attend a sheriff's sale for any such purpose. A trustee, appointed for the sale of an estate, is altogether unlike, in this respect, to an attorney-at-law or counsellor, who is consulted as such, in regard to the title of an estate, by the person in possession and claiming to be the owner of it. If defects in the title are discovered, upon such occasion, by the attorney or counsellor, he is bound to keep them secret, and not to disclose them; nor will he ever be permitted to secure a benefit to himself, by means of his knowledge so acquired, to the prejudice of his client. The difference between the duty, in this respect, of a trustee for sale and an attorney or counsellor, is founded on reasons too obvious to require them to be mentioned, though both may be said to stand in a fiduciary character. In some other respects, their duties are alike, and the same rule applicable to both. The case of a solicitor in bankruptcy has been mentioned as coming under the same rule with the assignees, and disqualified from purchasing any of the bankrupt's property for his own use absolutely; though, as it is said, he has no control over the sale, nor anything to do with it. It is true that the property which did belong to the bankrupt is vested in the assignees, and that the sale and transfer thereof must be made by them; but it is also equally true that it is the duty of the solicitor, in point of law, to insist that the assignees shall make the utmost value of the property; *Ex parte Lacey*, (6 *Vez.* 629); and, that this end may be attained, it is further his duty to examine the title to the property, ascertain its value, and not to suffer it to be brought to sale until all the information that can be acquired, in this respect, is obtained for the benefit of the assignees, under the circumstances likely to make it yield its utmost value. *Ex parte Bennett*, (10 *Vez.* 385). And hence Lord Eldon observes, in this last case, that perhaps he is, upon principle, the individual, of all others, disabled to purchase. See also *Ex parte James*, (8 *Vez.* 346).

The case of *Van Epps* v. *Van Epps*, (9 *Paige* 238), has been cited by the counsel for the defendant in error, and much relied on to sustain their side of the question. The defendant, in that case, being a trustee in a mortgage for $6000 on a property, which three years before had been sold for $15,000, became the purchaser thereof for his own use, at a sale made of the same by a master in chancery, under a decree of foreclosure on a prior mortgage of $5000, with some interest due thereon, for $6450, a sum, perhaps,

[Fisk v. Sarber.]

not much more than sufficient to cover the debt and interest due on the prior mortgage; and it was held by the chancellor that he was not capable of purchasing the property absolutely for his own benefit. The chancellor, in delivering his opinion, says, it was the duty of the defendant, as the trustee and holder of the junior mortgage, to make the mortgaged premises, if possible, produce upon the sale sufficient not only to pay off the prior encumbrance and the costs of foreclosure, but also to satisfy the subsequent encumbrance, which he held in his fiduciary character. Now if the master in chancery had the sole and exclusive power entrusted to him of making the sale, and it was his duty, as in the case of a sheriff selling under judicial process, to obtain the utmost price that could be had for the property, it is not easy to perceive why it was necessary for the defendant to attend the sale, or how it was possible for him to aid in raising the price, except by bidding for the property ; but surely it will not be pretended that he was bound to do this, unless he could do it for his own benefit. It would seem, however, that the chancellor did not consider the entire responsibility of obtaining the highest price that could be had for the property as resting with the master, as is certainly the case with the sheriff who makes a sale under judicial process, but that it was divided between the master and the defendant in some way; and therefore the purchase by the defendant for his own use came in conflict with his duty as trustee, which rendered him incapable of holding it. Yet in England, a mortgagee is allowed to bid under an order in chancery for the sale of the mortgage estate, *Ex parte Marsh*, (1 *Madd. Chan. Rep.* 148, *in note*), which shows that he is not considered there as having any control over the sale which could tend to depress the price, and that the master appointed to make it has the entire direction of it, so as to obtain the highest price for it ; so a creditor in England, taking out execution, may, according to the rule established in equity, as well as at law, become a purchaser of the property seized under it, whether it consist of goods or leasehold, because it is the sheriff, and not the creditor, who sells. *Stratford* v. *Twynam*, (1 *Jacob* 418). The chancellor, in *Van Epps* v. *Van Epps*, says, the result of the conflict between the private interest of the defendant and his duty as trustee, was, that a farm which in April 1837 was sold for $15,000, was, within three years from that time, bid in by him for the comparatively small sum of $6450. If this had been shown in any way to have been the case, for it does not necessarily, nor can it even probably be inferred, as resulting from the mere circumstance that the defendant was a trustee, upon any natural or rational principle, it would have been a plausible ground, at least, for deciding against the defendant; but as it was, I must confess, that I am not prepared to approve the decision ; for it does appear to me that the property was taken out of the hands of the defendant and placed altogether beyond his control or influence, as a

trustee, so that he had no duty as such to perform in regard to it, and that his bidding for it was necessarily calculated to raise, and not to depress the price.

Seeing, then, that Fisk, as I think I have shown, had no duty to perform whatever, in regard to the sheriff's sale of the property, in the case before the court, that would possibly conflict with his buying it for his own use, there seems to be no ground upon which he ought to be considered disqualified to do so. His becoming a bidder with a view to buy at the sale, increased the competition in bidding for the property, and necessarily tended to raise the price, so as to promote the interest of all concerned in its bringing the utmost cent of its value. It was for the purpose of promoting this great end, that the rule was established which prevents trustees, as also judicial or executive officers, and all others acting in a fiduciary character who are entrusted with the selling of property for the benefit of other persons, from buying thereat for their own use; but when they cease to have any power over, or concern with the sale, and it is to be made by another legally appointed for that purpose, to whom the whole management and direction of it is entrusted, the rule becomes wholly inapplicable. Hence, in this State, it has ever been held, that an executor or administrator may purchase the lands of the deceased, taken in execution and sold upon judgments obtained against such executors or administrators, for debts justly due, where they have no assets in their hands with which they can pay them; and this, too, before the passage of a late Act of Assembly, even where the executor was a devisee in trust under the will to sell the estate for the purpose of paying the debts of the testator. In *Riddle* v. *Murphy*, (7 *Serg. & Rawle* 230), where the administrator with the will annexed purchased the land of the testator taken in execution and sold by the sheriff on a judgment confessed by the administrator, for a debt said not to be owing at all, and where he had assets sufficient in his hands belonging to the estate to have paid it, if it had been just, the sale, though held void, was held so on the ground of fraud in the administrators; and from the report of the case, it is clear that it never entered into the minds of the counsel opposed to the sale, or of the court, that the sale could be avoided upon any other ground than that of the fraud, shown to have been practised by the administrator.

So it is the practice for judgment and execution creditors to become the purchasers of either the personal or real estates of their respective debtors, at sales made of the same at their instance, on their executions by the sheriff, the propriety and legality of which has never been, and certainly, at this day, cannot be questioned; yet such practice is, perhaps, obnoxious to an objection somewhat plausible, to say the least of it. For every one, of any experience in this matter, knows that the plaintiff in the execution has, and may exert a control over the sale, to a limited extent,

that no one excepting himself can, by directing the sheriff to proceed to make the sale without delay, or to forbear until he shall give him further orders; and it is easy to perceive that the plaintiff in the execution, by the exercise of this control, may frequently purchase the property, if he wishes it, at a lower price than he could otherwise do, to the injury of the debtor and possibly of other creditors. The principle that he may purchase, was ruled also in New York, in *Sheldon* v. *Sheldon*, (13 *Johns.* 220), where in fact, too, he was a trustee for the creditors of the defendant, and next for the defendant himself, in the judgment and execution under which the property was sold. There, A. confessed a judgment to B., and B. covenanted to sell the property of A. under the judgment and apply a sufficiency of the proceeds to the payment of A.'s debts, and account with him for the remainder; and it was held by the Supreme Court of that State, that B. might himself become the purchaser at the sheriff's sale under the execution sued out on the judgment; and that he was not accountable to A. beyond the sum for which the property was sold to him, though he had made a profit by a re-sale of it. Now, in principle, it appears to me, that this case cannot be distinguished from the one under consideration. And why did the Supreme Court of New York so hold? Clearly because the sale was under the exclusive and entire control of the sheriff, whose duty it was to obtain the best price he could for it. It was likewise held by the same court, in *Jackson* v. *Woolsey*, (11 *Johns.* 446), that a guardian *ad litem* in partition, might become a purchaser, at a sale made by the commissioners appointed for that purpose, pursuant to an order of the court; because, says the Judge, in delivering the opinion of the court, " it was a public sale to the highest bidder, authorized by statute, and under the sanction and inspection of the court; therefore, without circumstances of direct fraud to support the allegation of its being void, it is valid in law." Now all this is literally true, and may be affirmed of every sheriff's sale made of real estate in this State, under judicial process. Indeed it is perfectly obvious that the principle and grounds of all the decisions on this subject go to show, most incontestably, that no one is incapable of purchasing property taken in execution at a sheriff's sale, though he may have stood in the relation of a trustee to it, unless he be the sheriff himself, his agent, or some one who has rendered himself incapable of buying for his own use by his having become the agent to buy for another. And the reason of this incapacity is obvious, in either case; for to permit the sheriff or his agent to purchase, would be making it his interest, which generally governs all men, to sell the property at as low a price as possible, instead of the highest; the law, therefore, wisely places him beyond all temptation to violate his duty, by rendering him incapable of buying either directly or indirectly. To permit one to purchase for himself, who has undertaken to buy for another, would be

[Fisk v. Sarber.]

permitting him to deceive and perpetrate a fraud, which the law abhors and will never sanction. So with regard to a person other than the sheriff or his agent, buying property at a sheriff's sale, it is laid down by this court in *Haines* v. *O'Conner*, (10 *Watts* 320), that a purchaser at sheriff's sale, who has paid the money, can only be held a trustee *ex maleficio*, on account of the existence of fraud, and when that is the case, he will be considered a trustee for the creditors and the debtor also, unless the debtor be *particeps criminis*. This principle is again recognised in *Fox* v. *Heffner*, (1 *Watts & Serg.* 376).

But in the case under consideration fraud is out of the question, for the sale appears to have been public, made upon due notice previously given by the sheriff, of the time and place appointed for that purpose, where Fisk was the highest bidder, and became the purchaser upon the strength of his own credit and responsibility, and accordingly satisfied the bank for the purchase money, to whom it was all coming, by giving them his note and a mortgage for the amount on the property sold to him. This, it is true, was done in pursuance of a proposal made by the bank anterior to the sale to Fisk, in case he should become the purchaser of the property at a sum exceeding $4500, but without any solicitation that appears on the part of Fisk to do so. But had there been a previous agreement between the bank and Fisk, to arrange the payment of the purchase money in the manner it was done after the sale, it would not have altered the case, for the bank had an unquestionable right to have bought itself at the sheriff's sale, by bidding the highest price, without paying any money other than the costs, when the price bidden fell short of the amount of their debt; and certainly any right that it had, in this respect, it could give on such terms as it pleased to Fisk. Indeed, the real motive of the bank for doing as it did with Mr. Fisk, is obvious; for from the whole of the case, it appears pretty clearly, that it despaired of getting a bid sufficient to cover the amount of their debt or claim from any person for the property, or even getting, at most, more than a dollar or so above $4500, $250 less than the amount of the principal of their debt, without including the interest due on it, excepting from Mr Fisk, and that, under this impression, the bank, in order to obtain from him, if possible, $4500 of their debt, proposed to give him time for the payment of the purchase money, so that if he purchased he might, if possible, make it out of the property by re-selling it. This was not only fair, but was well calculated to promote the interests of both Woolley and his creditors, by obtaining the highest price for the property that could be had for it under existing circumstances. The judgment of the court below is, therefore, reversed, and a judgment rendered by this court, on the case stated, for the plaintiffs in error against the defendant in error.

VI.—C *

[Fisk v. Sarber.]

ROGERS, J., *dissentiente.*— It is not my intention to analyze the testimony, although, in my apprehension, there would be no difficulty in proving that the facts in evidence disclose a case of combination between Woolley, the insolvent debtor, and Fisk, the assignee, to become the purchaser of the real property of the insolvent estate at a price which subsequent events have shown, was greatly below its real value, of which they, from their superior means of information, were well aware before and at the time of the sale. It could, also, I think, be further made apparent that the judicial sale, though nominally under the superintendence of the bank, was really under the control of Fisk, in consequence of a private and secret contract between them, and that in truth the sale was, in form, a means of conveyance adopted by the parties to cover the real transaction, and having the title passed to them under the sanction of a court of justice. If such was the state of facts, it is admitted it would bring the case within the principles assumed by a majority of this court. But I do not rest my objection to the judgment on that ground, but I take leave to protest against the broad principle for the first time held by this court, that at a judicial sale a trustee has the same right as any other individual to purchase the trust estate, with the single exception of an execution issued by himself or where in some manner the sale is subject to his government and control. In other words, according to the principles now asserted, the trustee must be both buyer and seller to invalidate the sale; that it cannot be impeached except by proof of actual fraud.

This, it is believed, is a fair statement of the principle ruled by the court, and it amounts to this: that the assignee of a bankrupt or insolvent estate, an assignee under a voluntary assignment, a trustee under an express or implied trust; an executor, a guardian, an attorney in fact or at law, in short, all and every person acting in a fiduciary character, has the same authority, and with the like consequences only, to purchase the trust property, as any other person, however disconnected with it, at a judicial sale, with this reservation only that he is prohibited from becoming the owner when he has the control of the sale, or, in other words, stands in the category of both buyer and seller; that the well established and wise rule, which prohibits the trustee from purchasing the trust estate during the subsistence of the trust, does not apply to such a case, but only exists where he has placed himself in the predicament of vendor and vendee. This is a limitation, with all due respect, of modern growth. It certainly never entered into the heads of the sages of the law, who have taken so much pains to explain and vindicate the reason and policy of the rule. If such an exception is admitted, it would readily occur to them that in a most numerous class of cases, which enter into the common transactions of life, *cestui que trusts* are entirely at the mercy of fraudulent trustees, who can plunder them without stint or limit, without

[Fisk v. Sarber.]

any effectual restraint or redress whatever. If the rule is so necessary and salutary, as it is uniformly declared to be by every jurist who has touched the question, is it not passing strange it should be restricted in its operation in a class of cases much the most numerous, and requiring at least as much protection from the effects of artifice and fraud? I will readily admit that in many, perhaps most of the cases, it has happened that the trustee was both seller and buyer; but, with deference, I submit, that the rule does not depend on that circumstance, but has its foundation in reasons much more extensive and comprehensive. And this, in my opinion, is most apparent from the rule itself, which covers more ground, and from the reasons given by the Judges in vindication of the rule, which they take unusual pains to enforce.

The principle uniformly held is this. *A trustee cannot act for his own benefit on a subject connected with the trust, during the subsistence of the trust.* No party can be permitted to purchase an interest in property, and hold it for his own benefit, *when he has a duty in relation to such property* which is inconsistent with the character of a purchaser on his own account, and for his individual use. That during the time the relation subsists, the trustee cannot, without the assent of the *cestui que trust*, put himself in a hostile attitude to the *cestui que trust*. *Van Epps* v. *Van Epps*, (9 *Paige* 241). "It is not sufficient," says SERGEANT, Justice, (*M'Ginn* v. *Shaeffer*, 7 *Watts* 415), "for a party, who has been clothed with a fiduciary character, to intrench himself in forms of law. Equity follows his character throughout, and clothes him with it, notwithstanding his endeavours to shake it off, in order that he may enjoy advantages derived from that character to the injury of others for whom he has acted. There is but one recognised path for a trustee to walk in, and that is, that all his views and conduct be directed to a faithful discharge of his duty as such; and where his acts may admit of two constructions, one rightful, the other tortious, in respect to his *cestui que trust*, equity will choose the former and reject the latter." The case of *Keech* v. *Sandford*, (*Select Cases* 61), is a strong case in illustration of the rule. There Chancellor KING held, that where there was lease of a market devised to a trustee for the benefit of an infant; lessor before expiration of the lease refuses to renew to the infant; trustee takes it himself; he shall be obliged to convey to the infant and account for the profits.

So much for the rule; and now for the reason of it. The principle has been adopted in chancery to prevent fraud, and moreover, to avoid as far as possible the temptation even to commit fraud. There may be, as is said in all the cases, the most satisfactory evidence that the transaction amounts to no more than what the general interest of justice requires, yet the trustee shall not be permitted to purchase for himself or another; because the powers of the court would not be equal to protect against decep-

tion in many cases, from the impossibility of ascertaining the truth in all cases. Moreover, to permit a trustee to bid, would be applying the information acquired by the trust to his own benefit. It is not necessary to show that the trustee has made any advantage by the purchase, for in *Ex parte Bennett*, (10 *Vez.* 385), it is said, if a trustee may buy in an honest case, he may buy in a case having that appearance, but which, from the infirmity of human nature, may be grossly otherwise; and yet the power of the court would not be equal to detect the deception. Human infirmity will rarely permit a man to exert against himself that providence which a vendor ought to exert, in order to sell the estate most advantageously for the *cestui que trust*, and which a purchaser is at liberty to exert for himself, in order to purchase at a lower price. It is further said that these principles should be enforced, to protect the rights of persons so circumstanced; for otherwise the temptation to fraud would be irresistible; and it is well known that no court is equal to the examination and ascertainment of the truth in much the greater number of cases. 10 *Vez. Jun.* 381; *Davoue* v. *Fanning*, (2 *Johns. Ch. R.* 252); *Hawley* v. *Cramer*, (4 *Cow.* 717); *Greenlaw* v. *King*, (5 *Lond. Jur.* 18).

The existence, therefore, of actual fraud is not required, for however fair and unexceptionable the conduct of the trustee may be, however adequate the price, yet the *cestui que trust* may, although the contract is not void, still consider the trustee clothed with his fiduciary character. The rule is intended to prevent fraud, and also to lessen the temptation to fraud, by affording no inducement to the trustee to act other than for the benefit of the beneficiary, inasmuch as he may lose by his purchase, but cannot gain by it. And also from the impossibility, in numberless cases, to unravel actual fraud, although it may exist in its rankest and most offensive form. The principle applies, however innocent the purchaser may be; for it is, as Chancellor KING says, poisonous in its consequences. The *cestui que trust* is not bound to prove, nor is the court bound to decide, that the trustee has made a bargain advantageous to himself. The fact may be, and yet the party may not be able to show it. It is to guard against the uncertainty and hazard of abuse, and to remove the trustee from temptation, that the rule permits the *cestui que trust* to come in at his own option, and without showing essential injury, to insist upon having the experiment of another sale, or that the purchaser may be decreed a trustee and made to account for the profits. The prohibitions, the wisdom of which has been repeatedly shown, arise from the subsisting relation of trusteeship, nor can they be dispensed with until the relationship is completely dissolved, unless by clear, unequivocal assent of the beneficiary. It will not be denied that this observation applies not only to trustees, strictly so called, but to all persons standing in like situation, such as assignees, and solicitors of a bankrupt or insolvent estate, who are

[Fisk v. Sarber.]

never permitted to become purchasers at the sale of the bankrupt or insolvent estate.

But these principles, which are so firmly established by a long train of decisions, and which have been so anxiously preserved, are now, in my judgment, of but little practical worth, because under the decision just made, they can, and inevitably will be secretly evaded, and almost without the possibility of detection. All that will be necessary, for example, for an assignee of an insolvent debtor or an assignee under a voluntary assignment to do, when he desires to possess himself of the insolvent estate, will be to *permit* or *procure* a judicial sale; and this, it is obvious, he may readily do with but little chance of detection. He may then, almost beyond the possibility of prevention, do by indirection, by neglect of duty, by fraudulent procurement, that which, it is confessed, he cannot do directly. When this doctrine is announced and generally understood, we shall hear no more of sales by trustees, assignees, or guardians, when the estate is, as here, known to the initiated to afford a chance for speculation. It would be a waste of time to run the argument out on this view of it. Its alarming and pernicious consequences must at a glance strike the mind of every man acquainted with the operations of the human heart, and the facility with which fraud, in such cases, may be committed without the possibility of discovery. It is only necessary to suggest it to feel its force. You will find all such sales conducted with the most scrupulous regard to unessential forms, where the sale is conducted nominally by the sheriff and creditor, really by the trustee; or when really by the creditor, but little attention will be paid to the manner of sale. Having determined to purchase for his own benefit, why should he care to what extent the estate has been depreciated in price by artful misrepresentations, by irregularity in conducting it, and fraudulent practices either by himself or others? We cannot expect him to complain of the cause which has operated so much to his own advantage. What court is competent to ascertain whether the catastrophe has been caused by his own breach of faith? It is to prevent this the rule is so strenuously insisted on. It is founded in a jealousy of the trustee, and upon the possibility, at least, that he may be guilty of a fraud which it is difficult for a court to detect. Can it admit of doubt, that if we relax the rule to the extent claimed, the interest of creditors and of debtors must inevitably fall a sacrifice to the cupidity of fraudulent assignees? In my judgment, this is not the time to increase the temptation to commit fraud. It is the duty of the assignee, when he has funds in hand, or can procure them by reasonable diligence, to pay a debt pressing on the estate, and relieve it from a forced sale; and when he purchases and is chargeable with any neglect of the nature stated, it will hardly be denied, equity will declare him accountable for the profits. But what a temptation does this present to falsify his accounts, and by

VI. — 5

such means conceal a fraud which would inevitably strip him of his ill-gotten gains. In whatever aspect the proposed relaxation of the rule is viewed, it is pregnant with consequences most alarming and disastrous to the best interests of society.

But, it is said, that upon proof of actual fraud, the creditors may be relieved. But may not the fact be so and yet the party not able to show it? And is it not to guard against this uncertainty and hazard of abuse, and to remove the trustee from temptation, that the rule permits the *cestui que trust* to consider the trust as still subsisting? That the duties of the trustee continue during the existence of the trust, is supported by all the authorities; and if this be undeniable, which I maintain it to be, the advocates of the adverse doctrine are reduced to this position. They must maintain, that where the property is *in gremio legis*, in the custody of the sheriff, so far as that property is concerned, the relation of trustee and *cestui que trust* is *ipso facto* defunct; that the trustee may abandon all care of the estate and hand it over to the tender mercies of the sheriff or creditor, under whose execution it is sold; that it is no longer the duty of the trustee to see that the best price is gotten for the land. With all due respect, in my judgment, this is a most alarming proposition, neither supported by reason, principle or authority. Is it not the duty of the assignee to see that the sale is properly conducted, according to all the forms of law, to guard, as far as human prudence can, against fraud, trick, artifice, chicanery, and gross sacrifice of the property? Would it not be his duty, in case the property was sold for a trifle, in comparison with its value, and particularly if there was reason to believe it had been procured by management, to ask for a re-sale? What would be thought of an assignee who would fold his arms and pay no further attention to an estate, on the flimsy and dishonourable pretext that the estate was in the hands of the sheriff, and he was not bound on principles of law, honour and honesty, to take further care about the property? Nay more, under such circumstances, to have the assurance himself to become the purchaser for his own benefit? Would not every honest and honourable mind abhor such conduct? Take the case of guardian and ward, for the principle now assumed, monstrous as it is, must be held to extend to it. Let us suppose a man dies leaving a large real estate encumbered with debts, a minor child and a faithless guardian, who, in consequence of his knowledge of the intrinsic value of the estate, a knowledge derived, it may be, from his parental relation, desires to become the owner. He *procures* or *permits* a suit to be brought by one of the creditors, and this, it must be allowed, can be readily done, judgment is obtained by his *permission* or *connivance*, an execution is issued and the property is seized, condemned, and in the hands of the sheriff; is it the law, I ask in the name of all that is just and sacred among men, that the fiduciary character of guardian is

*ipso facto* gone, that he is at liberty to become the purchaser of the estate and hold it discharged of the trust? If this be so, it is very obvious that minors have but little protection from the acts and frauds of corrupt guardians. Who, I ask, is left to protect the interests of the minor, if his guardian can withdraw himself from the duty which the law has imposed upon him, and which he has voluntarily assumed, and put himself in a hostile attitude to his ward? If in the case supposed there has been any irregularity or fraud in the manner of the sale, and the property in consequence thereof has been sold for less than its intrinsic value, who is to ask the interposition of the court to protect the interest of the helpless ward, when the very person who stands in *loco parentis,* has put himself in an adverse position to him; in a position in which he has interests of his own, inconsistent with his fiduciary character? But what is the apology for this novel doctrine, by which one of the most salutary and wisest rules will be effectually overturned? It is founded on the notion that where the land is *in gremio legis,* the relation of trustee and *cestui que trust* ceases; but this, I think, I have shown already, is a most fallacious idea. The trustee, it is true, is not bound to advance his own money and purchase the land, but still he has a duty to perform in relation to the property and to the interest of the *cestui que trust.* The relationship still continues. He is bound upon principles of common honesty to use every reasonable exertion to obtain the best price for the property, and to do all other things which may promote his interest.

It is also alleged that it is an advantage to the beneficiary to permit the trustee to purchase, as it adds one more bidder to the list. But the law has wisely said that this leads to fraud, and it is far better for the interests of the beneficiary that the trustee should not be put in the way of temptation; that so far from being a benefit, in numberless cases, it will prove a serious detriment to the *cestui que trust.* And what says Chancellor KING, in *Keech* v. *Sandford,* (*Select Cases* 61), before cited? That, it will be remembered, was a lease of a market devised to a trustee for the benefit of an infant. The lessor, before the expiration of the lease, refused to renew to the infant; and the trustee took it to himself. The chancellor says; "I must consider this as a trust for the infant; for I very well see, if a trustee on the refusal to renew might have a lease to himself, few trust-estates would be renewed to *cestuis que use.* Though I do not say there is fraud in this case, yet *he should rather have let it run out than to have had the lease to himself.* This may seem hard, that the trustee is the only person of all mankind who might not have the lease; but it is very proper that rule should be strictly pursued, and not in the least relaxed; for it is very obvious what would be the consequence of letting trustees have the lease, on refusal to renew to *cestui que use.*" So here, others may purchase, but an inflexible rule of policy forbids

[Fisk v. Sarber.]

the trustee to become the purchaser. Besides, if this argument proves anything, it proves too much, as it is obvious that the same reason, if worth anything, holds good even where the trustee is buyer and seller, or where he orders and conducts the sale. It strikes at the very foundation of the rule itself, which it acknowledges is founded in wisdom, and established by an overwhelming current of decisions.

Another argument has been used, equally unsound. A creditor, it is said, may purchase at a judicial sale; and this is true, although he may have issued the execution, and have the control of the sale; so that this class of cases, in my judgment, proves nothing to the purpose; and if they do, they overturn the rule itself. But this admits of another answer, equally satisfactory; the reasons of the prohibition do not extend to creditors. 1. Because of the want of any fiduciary relationship between debtor and creditor; and next, because where he is guilty of any irregularity or fraud in the sale, or where the property has been sold at a sacrifice, a re-sale may be ordered by the court, on the application of the debtor or the other creditors. But this cannot be done by a minor; and it is unreasonable to expect it to be done by other creditors, or by the debtor, when the care of their interest is committed to a legal assignee or trustee, who, they have a right to expect, will diligently attend to the sales, and who they cannot suppose will voluntarily place himself in a situation inconsistent with his confidential character. By the acceptance of the trust, he pledges his honest endeavours to promote the interest of the *cestui que trust* by disposing of the property. The creditors may, therefore, very well suppose that, as an honest and conscientious man, he will not create in himself an interest inconsistent with this pledge, or put himself in an attitude which may seduce him from an upright fulfilment of his duty.

And thus the case stands on principle and on reason; and now let us inquire whether the same positions are not supported by authority. But before examining the cases more particularly applicable on this head, let me remark, that all these cases of a purchase at a sheriff's sale where the contest is between the purchaser and the debtor or the creditors, are aside of the question. They depend on the *mala fides* of the purchaser; and as there are no confidential relations between them, there is no rule of policy which forbids the purchase. There the ingredient to avoid the sale must be the proof of actual fraud. There is nothing from which the law infers legal fraud. The question we are considering is the rule, and the extent of it, which obtains, where a trustee or a person standing in a fiduciary character, such as an assignee for the benefit of creditors, or a guardian, &c. undertakes to purchase the estate of his beneficiary during the subsistence of his trusteeship, and contrary to, or without the assent of the *cestui que trust*. In considering this question, it must never be forgotten

[Fisk v. Sarber.]

that the true rule is, that being a trustee once, he cannot devest himself of that character and become a purchaser for his own benefit, whether the sale be public or private, judicial or otherwise, or whether he be the buyer or seller, or whether any other person conducts the sale. That being a trustee at the time of the purchase, he is held still to remain a trustee to all intents and purposes. And this rule a wise policy requires should be without exception, for otherwise the rule is worthless in a class of cases most numerous and useful, which enter into the business transactions of a commercial community. As has been before observed, I will readily admit that in most of the cases in which these principles have been held, the trustee has been both buyer and seller; yet in none has it been said, or intimated, that on that alone the principle depended.

The reasons adduced in support of the principle have a more extended and general application, and have been applied to the trustee during the subsistence of the trust, who is prohibited from purchasing for himself, without any reference to the accidental circumstance that he was at the same time the seller as well as the buyer. None of the cases, when fairly considered, will bear that construction, and it would be very unfortunate that they should receive such a narrow and confined interpretation, as the necessary consequence will be so disastrous to a helpless class of the community by evasion, fraud or artifice, without almost the possibility of detection. We all know how difficult it is to unravel the web of fraud, and particularly difficult will it be for creditors, dispersed, as they generally are, who cannot act in concert, and must be, even with all the guards we can put round them, very much at the mercy of an assignee who desires to appropriate the property of the debtor to his own use. How will it be possible for them to guard against a combination such as there is very good reason to believe existed here? In no possible way can it be done, except by adhering rigidly to the rule that an assignee shall make nothing out of the estate for his own benefit, let the sale be conducted in what manner it may, whether public or private, whether by him or at the instance of another. It is admitted that even if it be a judicial sale, yet if the trustee has the control of the sale, he cannot purchase; so that the principle is made to depend upon the fact that the trustee is buyer and seller; as, for example, where the property is sold on his execution, or where he has in some manner the control of the sale.

If, therefore, I am able to show that he has been held a trustee notwithstanding he was neither buying nor selling, nor had any manner of interest in or control of the sale, it seems to me, that on authority, as well as principle, there is an end to the distinction. I will not say that the doctrine is altogether without authority; for there is one case in which the principle is said not to apply to a judicial sale without any qualification whatever. I refer to the

VI. — D

decision of Judge WASHINGTON, in *Prevost* v. *Gratz*, (*Peters's C. C. R.* 364). According to that case, it is enough that it is a judicial sale; for where that is the case the trustee is at liberty to purchase and hold the estate discharged of the trust. But in the extent of the exception, it is conceded that the learned Judge is mistaken; for not to insist on the admission here, it is in direct opposition to *Riddle* v. *Murphy*, (7 *Serg. & Rawle* 230) ; *Lazarus* v. *Bryson*, (3 *Binn.* 59) ; *Moody* v. *Vandyke*, (4 *Binn.* 31 ; and *Van Epps* v. *Van Epps*, (9 *Paige* 240) ; *Swayze* v. *Burke*, (12 *Peters* 24); to which may be added numerous other authorities. The truth is, and I say it with all due respect, that *Prevost* v. *Gratz*, as to this point, was a hasty decision. It appears not to have been argued, and not to have been considered, either upon principle or authority, with that care which the very great importance of the principle required. It seems that the claim was made against Gratz by the complainant's counsel, but it was not seriously pressed. It is, therefore, not wonderful that it was not very seriously considered. The learned Judge dismisses it with the observation, " that he knows of no principle of equity which will invalidate the title of a trustee to land which the law has taken out of his hands, and which he purchased from one appointed by the same authority to sell it. This is precisely like the case of an executor who purchases at a sheriff's sale the personal property of his testator, seized and sold under an execution. The reasons which forbid a trustee from purchasing the trust-property, where he himself is the seller, do not apply to such a case."

The learned Judge evidently proceeds upon the hypothesis, that when the land passes into the hands of the sheriff, all care on the part of the trustee ceases; that the relation of trustee and *cestui que trust* is at an end, and that therefore he may create an interest in himself, although inconsistent with his pledge, and although it may seduce him from an upright fulfilment of his duty; that he is no longer bound to use his honest endeavours to promote the interest of the *cestui que trust* by acquiring for the property the best terms which can be obtained for it. The fallacy of that notion I have endeavoured to show, and its inevitable consequences; that it, in effect, will destroy the rule itself, and leave a large class of persons, and much the most numerous, to the tender mercies of assignees and others placed in confidential relations to them. I differ totally from him in the assertion that the reasons which forbid a trustee from purchasing the trust-property, where he himself is the seller, do not apply to such a case. That is an assertion without an attempt to support it by law, which I cannot comprehend; for, in my judgment, all the reasons, except one, apply as well to a judicial as to any other sale. The rule does not depend on the sale, or by whom it is made, but upon the person who becomes the purchaser. If he be a trustee, the rule is, without exception, that he cannot purchase during the existence of the

[Fisk v. Sarber.]

trust, without the express assent of the *cestui que trust*. It was formerly doubted whether the doctrine applied to a public sale, as a public auction, for example; but it is now held, that in all cases where a purchase has been made by a trustee on his own account, of the estate of the *cestui que trust*, although sold at public auction, it is at the option of the *cestui que trust* to set aside the sale, whether *bonâ fide* made or not. *Campbell* v. *Walker*, (5 *Vez.* 678, 680; 13 *Vez.* 601); 6 *Vez.* 625; *Ex parte Bennett*, (10 *Vez.* 381, 385–6); 12 *Vez.* 335; 5 *Madd. R.* 91. The authorities which have been already cited, also prove that he has been held to account for the profits, even where the property has been sold at a judicial sale. 2 *Whart.* 63.

It remains now to inquire, whether it has also been held applicable to a judicial sale even where the purchaser had no control whatever over the sale. That rule arises from the confidential relation between the parties, and not from the bare circumstance that the purchaser is buyer and seller, or that he has power to control the sale. It would seem to me only necessary to look through the cases, to come to the conclusion that the latter is the only rational foundation of the rule, and that it applies to all sales, public or private, judicial or otherwise, whether conducted by the purchaser or under the direction of an officer of the law.

A solicitor of a bankrupt or insolvent estate is not permitted to purchase at the sale of a bankrupt or insolvent estate, and yet he has not, as solicitor, anything to do with conducting or ordering the sale: and this, though not strictly a judicial, is in the nature of a judicial sale. *Ex parte Lacey*, (6 *Vez.* 625); *Ex parte James*, (8 *Vez.* 337); *Davoue* v. *Fanning*, (2 *Johns. Ch. R.* 252); *Ex parte Bennett*, (10 *Vez.* 381). An attorney for a creditor of a junior judgment to one on which process is issued, cannot, in this State, at least, purchase and hold in opposition to his client, provided the sale does not cover his client's debt. A contrary idea will hardly be advanced. *Black's Administrators* v. *Black*, referred to in *Campbell* v. *The Pennsylvania Life Ins. Co.*, (2 *Whart.* 63). I cite these cases as bearing very directly on this point, and showing the rule is founded exclusively on the confidential relations of the parties. But without insisting on these cases, and *Riddle* v. *Murphy*, (7 *Serg. & Rawle* 230); 3 *P. W.* 251; 12 *Pet.* 24, I now come to the case of *Van Epps* v. *Van Epps*, (9 *Paige* 241). In that case the estate was sold under a master's sale, upon a prior mortgage, and the purchaser was a trustee for several subsequent mortgagees. But notwithstanding, the court decided that he was not authorized to purchase the property sold for his own exclusive benefit, to the prejudice of the subsequent mortgage, which he held in trust for others. Here, it must be remarked, it was a judicial and public sale; it was sold under a mortgage, over which the trustee and purchaser had no control; for, it will be observed, the first mortgage had been assigned to the New York Life Insurance and Trust Company,

and, in consequence of the default of the mortgagee, the mortgage had been foreclosed, and was sold by them for payment of their debt. It is, therefore, a case in point. Now mark the ground upon which the chancellor founded his decree. " The rule of equity, which prohibits purchases by parties placed in a situation of trust or confidence with reference to the subject of purchase, is not, as the defendant supposes, confined to trustees or others who hold the legal title to the property to be sold; nor is it confined to a particular class of persons, such as guardians, trustees or solicitors. But it is a rule which applies universally to all who come within its principle; which principle is, that no party can be permitted to purchase an interest in property, and hold it for his own benefit, where he has a duty to perform in relation to such property which is inconsistent with the character of a purchaser on his own account and for his individual use."

And laying down this sound principle, the wisdom of which commends itself to every rational mind, the chancellor proceeds to state what is the duty of a trustee. He says; " here the duty of the trustee, as holder of the junior mortgage, was to make the mortgaged premises, if possible, produce upon the sale sufficient not only to pay off the prior encumbrance and the costs of foreclosure, but also to satisfy the subsequent encumbrance, which he held in his fiduciary character; and this duty came directly in conflict with his interest as a purchaser for his own benefit, to bid in the property at the lowest sum for which he could obtain it." The chancellor then states the result of the conflict, which, as might naturally be expected, results in the promotion of the interest of the trustee and the sacrifice of the interest of the *cestui que trust.* The chancellor further says ; " In cases of this kind the court does not suffer itself to be drawn aside from the application of the equitable rule, by any attempt to establish the fairness of the purchase. In the language of the learned commentator on American law, the rule is founded on the danger of imposition and the presumption of the existence of fraud which is inaccessible to the eye of the court. The policy of the rule is to shut the door against temptation, which, in cases where the confidential relation exists, is of itself deemed to be sufficient to create the disqualification. 4 *Kent's Com.* 438." If there is any difference between that case and this, I must be struck with judicial blindness, for I am totally unable to see it. Both are judicial sales, and in neither had the trustee a control of the sale, and the results of both were disastrous to the interests of the beneficiary; for in this case, Fisk, the assignee purchases a property for less than $5000, which has been made to yield, in his hands, upwards of $50,000. A more practical commentary on the wisdom of the rule could not be conceived. There is a well-grounded belief that Fisk was guilty of actual fraud; that he in truth was buyer and seller; and yet the fraud is inaccessible to the eye of the court. There is no want of charity in

[Fisk v. Sarber.]

supposing that his knowledge of the value of this property was derived from his confidential relations; and yet this, it seems, cannot be established to the satisfaction of the Court. Fraud is not to be presumed. That he has been exposed to the danger of temptation cannot be denied, and that he has not resisted the temptation I most firmly believe. It is, therefore, such a case as falls particularly within the rule, and about which the learned chancellor, who delivered the opinion of the court in *Van Epps* v. *Van Epps,* would not have had a particle of doubt, if that case be a faithful exponent of his views.

But the point has not only been ruled in New York, but by this court in *Bartholemew* v. *Leech* (7 *Watts* 472), where it is held, " that an agent having the charge of unseated lands cannot become a purchaser thereof at a sale for taxes, without a previous explicit renunciation of the trust." And here let it be remarked, that formerly lands were sold by the sheriff for taxes, but under the existing Acts by the treasurer; it is, therefore, a judicial sale, or in the nature of a judicial sale. And further, it cannot be pretended that the purchaser in *Bartholemew* v. *Leech* had any control whatever over the sale; besides, it was shown that the agency had expired before the sale. But what say the court through the Chief Justice: "It is not denied that the defendant's father had been the plaintiff's agent and curator of the land. The father himself testified that his agency had expired before the sale; but that is not enough. To capacitate him as a purchaser on his own account, he must have explicitly resigned his trust. The most open, ingenuous and disinterested dealing is required of a confidential agent, while he consents to act as such; and there must be an unambiguous relinquishment of his agency before he can acquire a personal interest in the subject of it. To leave a doubt of his position in this respect, is to turn himself into a trustee. It is unnecessary to recur to authority for a principle so familiar, or so accordant with common honesty. The agent was employed in this instance expressly to preserve the land from being sold; and taking his agency to have been left unclosed by the absence of an explicit renunciation of it, neither *Leisenring* v. *Black* (5 *Watts* 303), nor *Riddle* v. *Murphy* (7 *Serg. & Rawle* 230), presented a stronger case to restrain the agent from purchasing for himself. Within the three preceding years, he had been reimbursed his expenses and paid for his services; but that was not a dissolution of the previous relation."

So the Court thought and ruled in 1838, and I am sorry they have seen cause to change their opinion in 1843. It never occurred to any person that its being a judicial sale, conducted by a public officer, and not controlled in any way, could alter the established rule of law. It is put upon the broad principles of common honesty, which forbid a man to purchase, who stands in the confidential relation of trustee, until he has explicitly resigned his trust with

VI. — 6                    D *

the knowledge of the *cestui que trust*. It did not then enter into the mind of any person, that because the sale was a judicial sale, and the treasurer the seller, therefore the relation of trustee and *cestui que trust, ipso facto* ceased, and that consequently he was at liberty to purchase for himself. This case can only be supported on the broad and sound principle that the trustee cannot purchase for himself, while the confidential relation exists. If the Court was right then, of which I entertain no doubt, they are wrong now. In my judgment, the two cases cannot be reconciled.

· But there is still another case, *The York Buildings Company* v. *M'Kenzie*, (8 *Brown's P. C.*). This case is cited and recognised as an authority in *Davoue* v. *Fanning*, (2 *John. Ch. R.* 269), from which I extract the following statement of the case : " The appellants were an insolvent company, and their estates were sold by order of the Court of Sessions, at a *public judicial sale*, to satisfy creditors. The course at such sales is to set up the property at a value fixed upon by the court, which is called the upset price, and which is founded on information procured by the common agent of the court, who has the management of all the out-door business of a cause. The respondent here was the common agent in that case, and he purchased for himself at the upset price, no person appearing to bid more, and the sale was confirmed by the court; and in the course of eleven years' possession he had expended large sums for buildings and improvements. There was no question as to the fairness and integrity of the purchase. But the object of the appellant was to set aside the sale and have the estates sold anew, on the ground that the respondent being the common agent in court in behalf of all parties to procure information and attend the sale, was in the nature of a trustee, and so disabled to purchase. The appellants contended that the common agent was under a disability to purchase arising from his office; that the rule was founded in reason and nature, and prevailed wherever any well-regulated administration of justice was known; that the disability rested on the principle which dictated that a person cannot be both judge and party, and serve two masters; that he who is intrusted with the interest of others, cannot be allowed to make the business an object to himself, because, from the frailty of human nature, one who has power will be too readily seized with an inclination to serve his own interest at the expense of those for whom he is intrusted; that the danger of temptation does, out of the mere necessity of the case, work a disqualification—nothing less than incapacity being able to shut the door against temptation, when the danger is imminent and the security against discovery great; that the wise policy of the law had therefore put the sting of disability into the temptation, as a defensive weapon against the strength of the danger which lies in the situation; that the parts which the buyer and seller have to act, stand in direct opposition to each other in point of interest; and this conflict of

[Fisk v. Sarber.]

interest is the rock, for shunning which the disability has obtained its force, by making that person who has the one part intrusted to him, incapable of acting on the other side."

" The counsel of the respondent admitted the general principle, and contented themselves with denying its application, holding that the common agent was not to be considered in that case, and in respect to that sale, in the character of either seller or trustee. But the House of Lords thought otherwise, and set aside the sale, ordering the purchaser to account for the rents and occupation in the meantime, with a liberal allowance to him for his permanent improvements." This was a judicial sale beyond doubt, and the counsel puts the ·case on two grounds; that the common agent was a buyer and seller, and, secondly, on the more general ground that he stood in the relation of a trustee. It must be remarked that the respondent admits that if he was either, the sale must be set aside. It never occurred to him to urge that as it was a judicial sale, the purchaser, though trustee, unless he was both buyer and seller, had a right to hold the property discharged from the trust. This discovery was reserved for more modern times.

On these grounds, I feel myself with the utmost reluctance compelled to dissent from the judgment of the Court, or rather from the reasons assigned for the judgment. It may, perhaps, not be improper to state, that as there were other reasons for the judgment, I must still with great respect consider this point as an open question.

The correctness of this opinion, it will be observed, depends upon very simple, and, as I believe, well-established principles. First, a trustee is prohibited from purchasing the trust estate during the existence of the trust; and second, that the trusts subsist, at least for certain essential purposes, notwithstanding the property is in the hands of a judicial officer. This it has been my aim to prove on principle and authority; and if these principles are assumed, it follows as a necessary and inevitable consequence that a trustee, who becomes a purchaser even at a judicial sale, takes the estate clothed with the same trusts as before the sale, and is accountable as such for the profits.

Judgment reversed, and judgment for the defendants.