# Appeal of Lusk et al.

1. A trustee may be a purchaser of the trust property at a judicial sale not controlled by himself, when purchased in good faith, to protect the interests of himself and others.

Fisk *v.* Sarber, 6 W. &. S. 18, followed.

2. Section 72 of the Act of June 16th, 1836, (P. L. 774) provides for executions against corporations. Sections 73 and 74 provide that upon the return of such execution "unsatisfied in part or in the whole," the court may award a writ to sequester the goods, &c., and appoint a sequestrator. The Act of April 7th, 1870, (P. L. 58) provides that in lieu of said sequestration proceedings a fi. fa. might issue commanding the sheriff to levy the debt of any "personal, mixed or real property, franchises and rights of such corporation." The property and franchises of a railroad company were sold at sheriff's sale under an ordinary fi. fa., and without a previous return of nulla bona, to certain officers and stockholders who reorganized the company under another charter. Some objecting stockholders petitioned the court to set aside the sale upon the single ground of fraud and collusion, and their petition having been dismissed, filed a bill in equity two years afterwards for the same purpose, on the grounds of fraud and irregularity in the execution process, against the purchasers and the new company.

*Held,* (1) that the irregularities in the sale could not be taken advantage of after such lapse of time and under the circumstances of the case; (2) that the allegations of fraud in the bill were not warranted by the evidence.

[Appeal of Lusk.]

November 13th, 1884. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

APPEAL from the Court of Common Pleas No. 1 of *Allegheny county:* Of October Term, 1884, No. 131.

This was an appeal by J. S. Lusk and some one hundred and sixty others from a decree of the Court of Common Pleas of Allegheny county dismissing a bill in equity filed on October 10th, 1881, by said J. S. Lusk et al. against James Callery and others and the Pittsburgh & Western Railroad Company, for the purpose of having set aside a sheriff's sale of the Pittsburgh, Newcastle & Lake Erie Railroad, at which sale said railroad had been purchased in the interest of the defendant and reorganized by them under the name of the Pittsburgh & Western Railroad.

The bill set out, substantially, that the complainants were stockholders of the Pittsburgh, Newcastle & Lake Erie Railroad Company, incorporated September 1st, 1877, to extend from Allegheny City to Wertemburg, Penna., and actually completed from Pine Creek on the Western Pennsylvania Railroad to Zelienople and graded from thence west with the use of the Western Pennsylvania Railroad to Allegheny City. That there were subscribed and paid $194,000 of stock; a mortgage placed on the road, &c., securing $225,000 of bonds of which $190,000 had been sold; that the road was fully equipped at an expense of over $400,000, and doing a remunerative and increasing business. That upon August 27th, 1879, the franchises and property of the road were sold to A. M. Brown, James Callery and John W. Chalfant (three of the defendants) for $5,500, upon a fi. fa. issued upon a judgment entered July 16th, 1879, at No. 164 of July Term, 1879, in favor of John H. Shoenberger against the company, the purchase being on account of said purchasers and the other defendants. That the defendants thereupon organized as the Pittsburgh & Western Railroad Company, received a charter to operate the road, and took possession of all the assets, franchises, &c., of the Pittsburgh, Newcastle & Lake Erie Railroad, the officers and directors of the latter company continuing in office in the new company so formed, of whom the president, vice-president, secretary and three of the directors were defendants. That the sheriff sale was procured by collusion between these officers with the other defendants for the purpose of divesting the plaintiffs and other stockholders of their property therein and obtaining the road for themselves. That the judgment on which the sale was made was assigned previously thereto to A. M. Brown (a defendant) who bought it with the money of the company, and that notice of the invalidity of the sale was given to the sheriff on the day by

the attorneys for the Pittsburgh, Newcastle & Lake Erie Railroad Company. The bill further averred that no notice was given to the stockholders generally, that the company was embarrassed and the property exposed to judicial sale and no appeal to them made or opportunity offered for them to protect their interests, that those of them informed of the sale were told that it was to get rid of fictitious stock, and in the interest of the stockholders, and the purchase would be for the benefit of bona fide stockholders and to preserve their interests; and that all the just debts and liabilities of the company would be paid. That the sale under the fi. fa. was unauthorized by law and void.

The bill prayed that the defendants might be decreed to be trustees of all the property, assets and franchises now held in the name of the Pittsburgh & Western Railroad Company for the stockholders of the Pittsburgh, Newcastle & Lake Erie Railroad Company, who were such on August 27th, 1879, to account to said plaintiffs and stockholders for said property and its accumulations, and for an injunction against any further alienation or incumbrance or management thereof.

After answers filed the case was referred to E. Y. Breck, Esq., as Master, before whom some 500 printed pages of testimony were taken upon the facts in dispute.

It appeared from the testimony that the fi. fa. issued upon a præcipe to the prothonotary to "issue fi. fa. in this case," and was in the usual and ordinary form, commanding the sheriff that "of the goods and chattels, lands and tenements of the Pittsburgh, Newcastle & Lake Erie Railroad Company, he should cause to be levied and made the sum of $5,000," &c. To this writ the sheriff made return of levy on July 18th, and sale on August 27th, 1879, of "all the franchises, rights and property, real, personal and mixed of the said Pittsburgh, Newcastle & Lake Erie Railroad Company to A. M. Brown, James Callery and John W. Chalfant for $5,500," subject to a certain mortgage, and contractors' claims, &c.

After the confirmation of the sale by the court a number of objecting stockholders, including some of the present plaintiffs, filed a petition to have the sale set aside on the ground of fraud and collusion, which petition was quashed and dismissed by the court.

It also appeared from the testimony that all the old stockholders including the plaintiffs were permitted if they desired to come into the new company upon equal terms, including as a condition of the arrangement that they should contribute proportionately to the expenses of the undertaking, though this fact was disputed by the plaintiffs.

[Lusk's Appeal.]

The Master reported a decree that by the said sheriff's sale sundry of the defendants became trustees *ex maleficio* of the franchises and property of the Pittsburgh, Newcastle & Lake Erie Railroad Company for the plaintiffs as stockholders and liable to account to them and pay the proportionate value of the stock ascertained by him to be $127 per share.

Exceptions filed by the defendants to the Master's report were sustained by the court and a decree made dismissing the bill at the costs of the plaintiffs, whereupon the plaintiffs took this appeal, assigning for error the findings of fact by the court and the decree dismissing the bill.

*M. A. Woodward* (with whom was *O. D. Thompson*), for the appellants.—The sheriff's sale was absolutely void, being under a first and common fi. fa. not containing any command for levy and sale of the corporate franchises.    The Act of April 7th, 1870, which provides for the sale of the franchises of a corporation under a fi. fa. affords a remedy in lieu of the old process of sequestration under §§ 73, 74, of the Act of June 16th, 1836.    This was only available after an ordinary execution had been returned unsatisfied, and consequently an ordinary fi. fa. should have been issued and returned *nulla bona*, before the special fi. fa. under the Act of 1870 could issue.    As this Act provides that the special fi. fa. shall command the sheriff to levy the debt of "any personal, mixed or real property, franchises and rights of such corporation" it is essential that the execution shall conform to the Act:    Fox *v.* Hempfield Railway Co., 8 Phila. 639; Flagg *v.* Farnsworth, 12 W. N. C. 500; Second National Bank of Titusville *v.* Gibbs & Sterrett Mfg. Co., 13 W. N. C. 174; Philadelphia & Baltimore C. R. R.'s Appeal, 20 P. F. S. 356; Bayard's Appeal, 22 P. F. S. 453. The partnership Act of April 8th, 1873, P. L. 65, has been similarly construed: Hare *v.* Commonwealth, 11 Norris 144; Kaine's Appeal, 11 Norris 273; Vent *v.* Pashley, 9 W. N. C. 559.    The defence relied on is the alleged laches of plaintiffs.    The delay was but for two years, and there is no evidence that the defendants were in any way affected by it.

The defendants being officers of the company, and as such trustees for the stockholders, could not purchase at the sheriff's sale: Hill *v.* Frazier, 10 Harris 320; Parshall's Appeal, 15 P. F. S. 224; Christy *v.* Sill, 14 Norris 386; Morey *v.* Herrick, 6 Harris 128; Duff *v.* Wilson, 22 P. F. S. 442; Aultman's Appeal, 2 Out. 505.

*Thomas M. Marshall* and *George Shiras, Jr.*, for appellees.— The sheriff's sale of the franchises upon an ordinary fi. fa. without a previous return of *nulla bona* was at most an irregu-

larity which must be objected to at the time: Williams *v.* Lawrenceville R. R., 21 Pitts. L. J. 187. The sale was not void, and after the lapse of time will not be so decreed by a court of equity: Ashhurst's Appeal, 10 P. F. S. 290; Evans' Appeal, 31 P. F. S. 278; Neely's Appeal, 4 Nor. 387. The defendants had the right to purchase at sheriff's sale, and there was no proof of actual fraud: Fisk *v.* Sarber, 6 W. &. S. 18; Ashhurst's Appeal, 10 P. F. S. 314.

Mr. Justice PAXSON delivered the opinion of the court, January 5th, 1885.

The appellants, who were the complainants below, were stockholders in the Pittsburg, New Castle & Lake Erie Railroad Company. A portion of the appellees were also stockholders in the same company, and with others, now claim to own the property and franchises of the said company by virtue of a title acquired through a judicial sale thereof. The appellants filed this bill by which they claimed to hold appellees responsible for the value of their stock. They say in the first place, that the sale was unauthorized by law, and therefore void as against them and their rights as stockholders; and 2d: That if even the sale should be held valid, yet that said sale was procured by collusion and fraud on the part of the appellees, some of whom were officers and directors of the road, and in duty bound to protect the property of the company; that they deceived the complainants, and prevented them from bidding at the sheriff's sale by assurances that they (the defendants) would buy the franchises and property of the company for the benefit of all the creditors and honest stockholders; that they stated their object to be to " wipe out the bogus stock," and place the company upon a solid footing. In other words, that they had committed such acts of fraud as constituted them trustees *ex maleficio* for the stockholders intended to be defrauded.

While the argument of the case both at bar and in the paper books has taken a wide range, its discussion here can be compressed into a narrow compass. The principles which control the case are neither novel nor difficult of application.

The sale was made upon an ordinary writ of fieri facias. There appears to have been no attempt to comply with the provisions of the Act of 7th April, 1870, P. L. 58, which enacts that in addition to the provisions of the Act of 16th June, 1836, relating to executions, and in lieu of the proceedings by sequestration under said Act, by which the plaintiff in a judgment against a corporation, not excepted from the said Act, may " have execution by *fieri facias* issued from the court wherein said judgment is entered, which shall command the sheriff or

other officer to levy the sum of said judgment, with interest and costs of suit, of any personal, mixed, or real property, franchises and rights of such corporation, and thereupon proceed to sell the same," &c., &c.

In the somewhat analogous cases of Hare *v.* The Commonwealth, 11 Norris, 141, and Kaine's Appeal, Id. 273, where an Act similar in terms authorized the sale upon a *fieri facias* of the interest of a partner in a firm, we held that the fieri facias must be a special writ commanding the sheriff to sell the interest referred to. In each of the above cases the contest was between execution creditors upon distribution, and it was held that the execution which complied with the Act would take the fund without regard to the time of the levy. But neither case decided that a sale of a partnership interest upon an ordinary fieri facias was void and passed no title. Nor are we prepared to say so now. Such sale would undoubtedly be set aside upon the application of a party in interest if made at the proper time. But after the confirmation of the sale by the court, it cannot be attacked and overturned collaterally years afterward. This is especially true where the property has passed into the hands of a bona fide purchaser and rights of third parties have grown up. The principle is too well settled to need the citation of authority that mere irregularities in a judicial sale must be taken advantage of prior to confirmation.

For the same reason we need not discuss the question whether a return of *nulla bona* should have preceded the levy and sale upon the fieri facias. If necessary, which we do not assert, it was but an irregularity which may be waived, and acquiescence in the sale is such waiver.

The allegations of fraud may be reduced to the following heads, viz. :—

1st. That the purchase money paid at the sheriff's sale was the money of the Pittsburg, New Castle and Lake Erie Railroad Company.

2d. That the Pittsburg, New Castle and Lake Erie Railroad Company was solvent, and that the directory had pecuniary resources sufficient to conduct the enterprise to a successful termination.

3d. That the defendants fraudulently conspired together to procure a sale of and to purchase in the property of the complainants; and that by this conspiracy complainants were prevented from purchasing at sheriff's sale, and as a part of such conspiracy that the defendants informed a portion of the complainants at the sheriff's sale, and afterwards, that their purchase would be for the benefit of all the honest stockholders and creditors.

The first proposition is wholly unsupported. The Master has found upon abundant evidence that A. M. Brown, Esq., was neither an officer nor stockholder of the Pittsburgh, New Castle and Lake Erie Railroad Company; that the evidence that he bought the judgment upon which the sale was had with his own money to protect the claim of a client is uncontradicted; and that his position was hostile to the company throughout. There is nothing upon this branch of the case to discuss.

Upon the second proposition the Master and the learned court do not agree. The finding of the Master is vague. He says: "From this testimony the Master is of opinion, and so finds, that the financial condition of the Pittsburgh, New Castle and Lake Erie Railroad Company was not such as to require or justify the sale on a first writ of fieri facias of all its franchises, rights, privileges and property," &c. This is a deduction, not from facts which the Master has specifically found, but from certain testimony which he cites. The court below was more explicit. The learned judge said: "Without entering into a special detail of the evidence, it is sufficient to say that it leads me to conclude, beyond a doubt, that the company was hopelessly insolvent." I have carefully examined every word of the vast mass of testimony in this case, and am of opinion it fully justifies the view of the learned court. Indeed, I am unable to see how any one accustomed to considering and weighing evidence could arrive at any other conclusion. There was in evidence, it is true, an alluring statement rendered to the company of its assets, but that statement was confronted by the hard facts that the company was not earning enough to pay its current expenses and interest on its bonds; that it was hopelessly in debt, and had neither money nor credit; that all of its unsold bonds and other securities were hypothecated; that at the time of the sale many of its employees had not been paid for months, and that it had only been kept afloat by advances of money and credit by some of the officers and directors. The limited amount of rolling stock used by the company was either held under lease or pledged for debt, and one of its two locomotives would have been taken off the road had not Mr. Callery and Mr. Marshall, two of the defendants, given their personal obligations to prevent it. Its stock had no market value, and its bonds were greatly depreciated. In view of this state of facts it is not necessary to discuss the question whether the judgment on which the property was sold could have been paid and the sale averted. The evidence does not show either cash on hand or available assets to avert it, and the defendants were not bound to make further sacrifices in aid of the company.

And had this particular debt been paid it would have been of no permanent advantage, as the company had reached a point when a reorganization, or a large increase of its capital, was a condition of its existence.

We now approach the last and most important branch of the case. Here again the Master and the court below differ upon the facts, and we are compelled to resort to the evidence to decide between them. The finding of the Master is in substance, 1st, That the defendants combined to procure a sheriff's sale of the property and franchises of the company, and 2d, " That prior to said sheriff's sale, said Gibson, Callery, Marshall and Chalfant acting singly and in concert, circulated and caused to be circulated among the stockholders in the Pittsburgh, New Castle and Lake Erie Railroad Company, reports or representations that said road was to be sold to wipe out bogus stock, and that the stock then held by plaintiffs would not be affected by said sale.

Just here it is important to bear in mind that the question of collusion in regard to the sheriff's sale is put at rest by the fact established in the cause, that the proceedings were adverse. Under such circumstances the defendants had the right to buy at the sale in order to protect themselves. It has been the conceded law of this state since the case of Fisk v. Sarber, 6 W. & S. 18, that at a judicial sale, not controlled by the trustee, the trustee can be a purchaser. The latest case upon this subject which has been called to my attention is that of Penn. Transportation Company's Appeal, reported in the Legal Intelligencer of November 9th, 1883 [5 Out. 576], in which it was held that stockholders of a railroad company may bid, in pursuance of a private agreement between themselves, and buy in the road and franchises, and such sale will not be disturbed.

The defendants had the clear legal right to buy in the road and its franchises at the sheriff's sale. They had a right to unite for that purpose. Hence the paper marked " Exhibit W.," about which so much useless testimony was taken, becomes of no practical importance. Whether it was executed the day of the sale, the day before, or the day after, is immaterial. It furnishes no evidence of a combination to *procure* the sale of the road. Nor is any such evidence to be found in the record; at least I have been unable to discover it after a diligent search. The paper referred to shows merely that the defendants knew of the proposed sale of the road, and combined for the object of purchasing it and reorganizing the company upon the basis of additional capital. If, however, in doing this they resorted to any trick or artifice, by which other stockholders were prevented from bidding, and misled to their injury, there is abun-

dant authority for holding the defendant appellees trustees *ex maleficio* as to the stockholders defrauded. The rule is thus laid down in the recent case of Christy *v.* Sill, 14 Norris 380: " If a person obtains the legal title to property by such acts or circumstances of circumvention, imposition or fraud, or if he obtains it by virtue of a confidential relation and influence under such circumstances that he ought not, according to the rules of equity and good conscience, as administered in chancery, to hold and enjoy the beneficial interest in the property, courts of equity. in order to administer complete justice between the parties, will raise a trust by construction out of such circumstances or relation."

It remains to apply this crucial test to the defendants. The evidence by which this constructive trust is sought to be established is not of the most satisfactory character, consisting of loose declarations of some of the defendants, made at or about the time of the sheriff's sale. But giving to it its widest scope, what does it amount to? From a mass of such testimony we select the following, which is perhaps the most favorable to the appellants. I quote from the testimony of Elias Zeigler, at page 213 of the Appendix: " Their statements were, I recollect, near the same. They all assured me that my stock and my contracts should not be interfered with, and also all the rest of the legal stockholders. That the idea was to clean out the whole thing; clean out all fictitious stock; then we could get along; have lots of credit and plenty of money; there would be no more trouble. This is about the statement they all made, with the exception of Mr. Passavant. He positively declared to me if that wasn't the case he would not have a thing to do with it, he wouldn't put his name on it at all. I told him that was my fix; if the idea was not to protect the legal stockholders I would not have anything to do with it at all."

There is no question here as to creditors. They are not complaining. The inquiry. is whether the defendants, in the reorganization of the company, treated the stockholders justly who may be presumed to have relied upon their representations. This brings us to the question, what had the complainants the right to expect from the above declarations? They knew that a reorganization of the company was contemplated, and. was necessary after the judicial sale. Whatever may be the fact, the belief certainly existed, both in and out of the Board of Directors, that stock had been issued which had not been paid for.. This is what was meant by the " bogus stock " which was intended to be " wiped out." Then there was to be " lots of credit and plenty of money," and " legal stockholders would not be interfered with." Yet the

[Lusk's Appeal.]

complainants must have known, they are presumed to have known, that the sheriff's sale destroyed every share of stock ever issued by the company; that their stock, or their rights. as stockholders, could only be preserved by a reorganization of the company and the issue of new stock upon terms to be agreed upon. In the reorganization of the company the complainants had no rights superior to the defendants. All that they could claim in equity or good conscience was that they should be admitted into the new company upon equal terms. If additional burdens were necessary they had no equity to throw them wholly upon the defendants. And additional burdens were necessary. The reorganization would have been a vain thing without additional capital. Where did the complainants. suppose the promised "plenty of money" was to. come from? Not from its earnings, as we have shown. Not from its cash assets, for all it had was pledged for its debts. The change of owners put no money in its treasury, paid no debts, and caused no increase of business. The only feasible plan by which the company could be successfully reorganized involved the raising of additional capital, which could only be done by issuing a limited amount of new stock, to be paid up in full, in lieu of the old stock. This was done; the defendants subscribed and paid for a proportion of it. If they gave the complainants an opportunity of coming in upon the same terms, what reason have they to complain? That they did offer the complainants the new stock upon precisely the same terms at which they took it themselves, is a conceded fact in the cause. Not only did they so offer it, but they begged the other stockholders to come in and take the new stock. They gave them notice of their right to do so by advertisements, and in addition some of the defendants, at least, searched out individual stockholders and urged their going in. For some reason they declined. It may be they expected the defendants to incur all the labor, and advance all the money necessary to make the new enterprise a success, and enjoy without cost to themselves the benefit of the enterprise and capital of others. If they did, it was an expectation wholly unwarranted by any promises made by the defendants, and so unreasonable that a court of equity would give little heed to it.

The allegations of fraud contained in this bill are not warranted by the evidence. The defendants were compelled, for the protection of their own interests, to reorganize the company. In doing so they gave every other stockholder the opportunity of coming in upon precisely the same terms which they imposed upon themselves. There was no fraud in this. It was merely a matter of business, and was disposed of upon principles neither offensive to the law nor to good morals.

12 OUTERBRIDGE—11

There are a number of questions which a different view of the case would have rendered it necessary to notice. Under the circumstances a discussion of them is not essential.

The decree is affirmed, and the appeal dismissed at the costs of the appellants.